UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

PAPA JOHN'S INTERNATIONAL, INC.,
JOHN H. SCHNATTER and STEVE M.
RITCHIE,

              Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:18-cv-07927-KMW

<u>CLASS ACTION</u>

AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAW

<u>JURY TRIAL DEMANDED</u>

Lead Plaintiff Oklahoma Law Enforcement Retirement System ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon the investigation of its counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by Papa John's International, Inc. ("Papa John's" or the "Company"), as well as securities analysts' reports and advisories, press releases, media reports and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons other than Defendants (defined below) who purchased or otherwise acquired Papa John's common stock between February 25, 2014 and August 7, 2018, inclusive (the "Class Period"), against Papa John's and certain of its officers and directors for violations of the federal securities laws. Plaintiff brings this action seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Papa John's operates and franchises pizza delivery and carryout restaurants under the Papa John's trademark in the United States and internationally. Papa John's is the third largest carryout and pizza delivery restaurant chain in the United States. Starting from humble beginnings, Papa John's was founded in 1984 by Defendant John H. Schnatter ("Schnatter") and quickly grew to become one of the most easily recognized brand names in the carryout pizza industry.

3.     The Company prides itself on the slogan "Better Ingredients. Better Pizza." because it believes that its commitment to using high-quality ingredients sets it apart from its competitors. Using the marketing campaign that it had "better ingredients," throughout the Class Period, the Company repeatedly told investors that its "best ingredient" was its employees and that it prioritized its commitment to its employees' success and happiness at the Company above all.

4.      As a part of this crusade, the Company established a Code of Ethics and Business Conduct (the "Code") in which it assured all employees that they had the "the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards" and that all employees were required to "maintain the highest ethical standards" towards each other because "[w]e must govern our conduct and ourselves by the principles of honesty, fairness, mutual respect, trustworthiness, courage and personal and professional commitment."

5.      Among other things, the Code required the Company and its employees to comply with "all applicable labor and employment laws and regulations" so that employees could work in an environment "that is free of harassment or other intimidating, hostile or offensive behavior based" on, *inter alia*, a person's race or gender.

6.      Despite these reassurances, the Company's most senior employees, including Defendants Schnatter and Steve M. Ritchie ("Ritchie"), cultivated a shockingly toxic work culture in which the Company's executives have been accused of directing lewd, sexually explicit behavior toward female subordinates.  Additionally, all employees were alleged to have endured a "bro culture" within the Company in which employees were exposed to offensive behavior, including a "spoils system" so that the employees who were in Defendants Schnatter and Ritchie's good graces were promoted, regardless of their qualifications.

7.      Throughout the Class Period, Defendants made numerous positive statements regarding Papa John's business, operational and compliance policies and repeatedly touted the strength and quality of the Company's culture.  As alleged herein, these statements were materially false and/or misleading because Defendants knew, or recklessly disregarded, and/or failed to disclose: (i) that Papa John's most senior employees, including the Individual Defendants (defined below), had engaged in or condoned sexual harassment and/or other inappropriate workplace

conduct at the Company; (ii) that the conduct of these senior executives violated Papa John's Code and created a hostile work environment; and (iii) that the foregoing conduct would negatively impact Papa John's business, sales and operations, and expose Papa John's to reputational harm and legal liability.

8.      Investors began learning about the virulent work environment within Papa John's corporate headquarters through a series of news articles published by *Forbes*.  First, on July 11, 2018, in an article entitled "Papa John's Founder Used N-Word On Conference Call" (the "7/11/18 Article"),[1] *Forbes* reported that Papa John's founder, Defendant Schnatter, had used a racial slur and made other inappropriate, racially-motivated comments during a conference call in May 2018.  Later that same day, Papa John's announced Schnatter's resignation as chairman of Papa John's Board of Directors (the "Board").

9.      Upon this news, the price of Papa John's common stock plunged to $48.33 per share, a decline of 5.1% from Papa John's closing stock price of $50.79 per share on Tuesday, July 10, 2018.

10.      Further corrective disclosures occurred when the Company announced on July 15, 2018, that it had created a special committee of the Board to "evaluate and take action with respect to all of the Company's relationships and arrangements with John H. Schnatter."  The press release also stated that the special committee specifically prohibited Defendant Schnatter from speaking on behalf of the Company.

---

[1]      Noah Kirsch, *Papa John's Founder Used N-Word On Conference Call*, FORBES (July 11, 2018, 5:00 AM), https://www.forbes.com/sites/noahkirsch/2018/07/11/papa-johns-founder-john-schnatter-allegedly-used-n-word-on-conference-call/

11.     The market reacted negatively to this news, with shares of Papa John's declining from a close of $53.55 per share, on Friday, July 13, 2018, to close at $51.41 per share when the market opened back up on Monday, July 16, 2018 – a decline of 4%.

12.     Additionally, on Sunday, July 22, 2018, the Board voted to adopt a "poison pill" to prevent Defendant Schnatter from gaining a controlling interest in the Company.  The market sharply reacted to this news, with shares of Papa John's stock declining from a close of $51.59 per share on Friday, July 20, 2018, to close at $46.56 per share when the market opened back up on Monday, July 23, 2018 – a decline of 9.7%.

13.     Then, while the market was still reeling from the news surrounding Schnatter, on July 19, 2018, *Forbes* published an article entitled "The Inside Story of Papa John's Toxic Culture" (the "7/19/18 Article").[2]  Citing "interviews with 37 current and former Papa John's employees – including numerous executives and board members," the 7/19/18 Article reported that "[t]o protect himself, Schnatter . . . installed loyalists in the firm's top ranks, who enabled its 'bro' culture."  The bro culture is alleged to have included an environment that was rife with sexual harassment and other demoralizing behavior towards Papa John's employees – a culture that was not only tolerated, but was encouraged, by Defendants Schnatter and Ritchie.  Former employees accused male superiors of "ma[king] references to 'gangbangs' and comments about whether women wanted 'to jump on the train'" and that female employees were asked about their bra sizes and whether they were menstruating when they disagreed with the decisions of male superiors.

14.     While all of this news unraveled, the price of the Company's stock fell precipitously, tumbling from its Class Period high of $89.52 per share on December 20, 2016, to $38.94 per share

---

[2]     Noah Kirsch, *The Inside Story Of Papa John's Toxic Culture*, FORBES (July 19, 2018, 6:00 AM), https://www.forbes.com/sites/forbesdigitalcovers/2018/07/19/the-inside-story-of-papa-johns-toxic-culture/1

on August 8, 2018 – *a decline of 56.5%*.[3]  After the market closed on August 7, 2018, the Company reported its financial results for the second quarter of 2018.  Investors learned that the Company's revenue for the quarter decreased *$26.8 million* and the Company was lowering its full-year outlook by decreasing the comparable sales for its most profitable geographic area, North America, to *negative 7% to negative 10%* for the full year.

15.     On this same day, the Company also revealed the extent of the damage that had been done as a result of its vitriolic workplace culture: (i) the Company would now need to spend millions of dollars to repair its tarnished reputation, including overhauling its general marketing campaign and donating half a million dollars to Bennett College, a historically black college, in an effort to regain the loyalty of the scores of customers that it lost; (ii) the Company would be providing franchisees with financial assistance to avoid closing stores throughout the country; and (iii) the Company would be expending a significant amount of money on legal and auditing fees.

16.     Before investors learned the full truth about the misconduct at Papa John's, Company insiders, including the Individual Defendants (defined below), collectively sold *1,468,414 shares* of their personally-held Papa John's stock, generating gross proceeds of more than *$102 million*.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

---

[3]     All emphasis is added unless otherwise noted.

19.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Papa John's stock trades on the NASDAQ, located within this District.

20.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21.     Lead Plaintiff purchased Papa John's common stock during the Class Period, as set forth in its previously filed certification, which is incorporated by reference herein, and was damaged thereby.

22.     Defendant Papa John's is incorporated in Delaware with its principal executive offices located at 2002 Papa Johns Boulevard, Louisville, Kentucky 40299.  The Company's common stock is listed and trades on the NASDAQ under the ticker symbol "PZZA."

23.     Defendant Schnatter is the founder of Papa John's and served as a director and/or officer of the Company throughout the relevant period.  During the Class Period, Defendant Schnatter served as the Company's Chief Executive Officer ("CEO") from April 3, 2009 through December 31, 2017.  Defendant Schnatter also served as the Company's President from May 15, 2014 through July 30, 2015.  Finally, Defendant Schnatter served as Chairman of the Board from May 10, 2007 through July 11, 2018.  Defendant Schnatter remains the Company's largest shareholder, owning approximately 26% of the Company's stock.  Defendant Schnatter signed the Company's annual and quarterly reports, filed on Forms 10-K and 10-Q, respectively, during the Class Period, until his resignation and/or termination from his positions of CEO and Chairman of the Board on December 31, 2017, and July 11, 2018, respectively.

24.     Defendant Ritchie served as a director and/or officer of the Company throughout the relevant period.  During the Class Period, Defendant Ritchie served as the Company's Senior Vice President from May 2013 through May 1, 2014.  Defendant Ritchie also served as the Company's Chief Operating Officer ("COO") from May 15, 2014 through December 31, 2017.  Defendant Ritchie has served as the Company's President and CEO since July 30, 2015, and January 1, 2018, respectively.  Defendant Ritchie signed the Company's annual report filed on Form 10-K for the fiscal year ended December 31, 2017.

25.     The defendants referenced above in ¶¶23-24 are sometimes referred to herein as the "Individual Defendants," and, together with Papa John's, as "Defendants."

26.     The Individual Defendants possessed the power and authority to control the contents of Papa John's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

27.     Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Papa John's business.

28.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Papa John's reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

29.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Papa John's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Papa John's common stock would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Papa John's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Papa John's business, operations, and the intrinsic value of Papa John's common stock, causing Plaintiff and other members of the Class to purchase Papa John's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

31.     Founded in 1984 by Defendant Schnatter, Papa John's operates and franchises one of the world's largest delivery and carryout pizza restaurants.  Shortly after graduating from college, Schnatter began his business in Jefferson, Indiana, by knocking down a broom closet in the back of his father's tavern and installing a pizza oven.  Papa John's opened its first restaurant in 1985 and began franchising in 1986.  As the founder of the Company, Defendant Schnatter was often featured in the Company's advertisements.  He starred in many of the Company's television commercials and social media ads and made public appearances on behalf of the Company, including at popular sporting events, like the National Football League's (the "NFL") Super Bowl.  Perhaps most notably, an image of Schnatter's face was incorporated into the logos that were printed on every pizza box that customers received.  Thus, at all relevant times, Schnatter's likeness was inextricably intertwined with Papa John's brand, reputation and goodwill.

32.     Papa John's attributes its success to its commitment to use higher quality ingredients than those of its competitors.  The Company was built on the promise that "[q]uality is at our core" and centers itself on the motto "Better Ingredients. Better Pizza."

33.     The Company's success brought in more than just profitable pizza sales – it also brought in notable partnerships.  Partnerships with major sports organizations include: the NFL, Major League Baseball, the National Collegiate Athletic Association's wildly popular men's basketball tournament known as "March Madness," and the National Hot Rod Association, the nation's drag racing association.  The Company also sponsored popular college football post-season Bowl games, such as the Papajohns.com Bowl in Birmingham, Alabama.

34.     Additionally, Papa John's became the official pizza of: Six Flags theme parks; Live Nation, the world's largest live music and events promoter and venue operator; and the

Meadowlands Stadium, the famous concert and sports arena that is home to the NFL's New York Giants and New York Jets.  Papa John's partnerships were not limited to specific companies or events but were also with famous celebrities like Taylor Swift and retired NFL player Peyton Manning.

35.     According to the Company's most recent annual financial report on Form 10-K for the quarter and year ended December 31, 2017, filed on February 27, 2018 (the "2017 10-K"), Papa John's operated and franchised 5,199 restaurants globally, including 3,314 restaurants located within the United States and 1,758 restaurants located in forty-four foreign countries or territories.  The 2017 10-K also stated that approximately 93% of the Company's total revenues were derived from its domestic company-owned restaurant sales, North America franchise royalties and fees and North America commissary and other sales segments.

36.     Therefore, between the Company's domestic partnerships and the revenue it derives from North American sales, any damage to the Company's image or brand would significantly impact Papa John's financial wellbeing.

**Papa John's Purported "Commitment" to Its Employees**

37.     Under the slogan "Better Ingredients. Better Pizza." the Company often told investors that its "best ingredient" was its "team members," projecting the false image that the Company was committed to caring for its employees.  Indeed, Papa John's was even recognized by the American Customer Satisfaction Index for its "trusted reputation" in 2015.  In response to the recognition, the Company stated that its employees "live[] by the acronym 'PAPA,' or 'People Are Priority Always,'" and that Papa John's employees "are the heart and soul of this company."  The Company also vowed "***we take care of our people[.]***"

38.     The Company consistently made similar statements throughout the Class Period, promising investors that it focused on "invest[ing] in our most important ingredient, our people, because . . . the strength of our culture will determine the success of our strategy."

39.     Similarly, the Company made positive representations about its corporate culture and leadership.  For example, Defendants told analysts and investors that "[t]he culture of Papa John's, really, is one that attracts really quality people" and that the Company's "continuous commitment to enhance culture and quality will further differentiate our premium brand from the rest of the industry."

40.     The Company would often use Defendant Ritchie as the shining exemplar of the Company's commitment to its employees' success.  In 1996, Ritchie began working at the Company as a customer service representative, earning just $6 per hour.  Over the years, Ritchie worked his way up the ranks.  In 2006, Ritchie became a franchise owner and operator and slowly began maneuvering his way into Schnatter's inner circle.  By 2014, Ritchie had captured Schnatter's attention and was awarded the position of COO.  From there, Ritchie's responsibilities at the Company began increasing, so that by 2015, he became President of the Company and on January 1, 2018, he also became the Company's CEO when Schnatter relinquished that title.

**Papa John's Fosters a Toxic Culture**

41.     Though Ritchie was given the title of President and was running the day-to-day operations of the Company long before Schnatter resigned as CEO, it was clear to those at the Company that Schnatter was still calling the shots.  According to a Papa John's employee who was quoted in the 7/19/18 Article, "[n]othing is happening [at Papa John's] unless [Schnatter] wants it to happen" and Schnatter's reign at the Company was so strong that "Papa John's has effectively been a public company operated like it is privately owned[.]"

42.     As described by former employees in the 7/19/18 Article, Schnatter cultivated a hostile work environment where employees were filled with fear and paranoia of getting on Schnatter's bad side.  According to Donna Alcorn, who served as a Senior Vice President at the Company until she resigned in 2010, Schnatter "had this tendency: When he was done with you, he was done with you" which was the reason why the Company's leadership was constantly changing. It was also reported that Schnatter was "prone to outbursts" and would recruit employees to spy on their coworkers and read their emails.  The Company essentially operated under the motto "Schnatter's way or the highway."

43.     Ritchie has been accused of shepherding this toxic culture by promoting those he was close to despite their qualifications, or lack thereof, for positions.  According to the 7/19/18 Article, Ritchie allegedly led the Company by "knee-jerk" reactions and failed to consider data metrics related to the accuracy of orders and other "logistical issues" when making decisions, for fear of upsetting Schnatter.

44.     For years before and during the Class Period, under Schnatter's, and later Ritchie's, leadership, numerous employees claimed that they were forced to endure the "bro culture" work environment that allegedly tolerated and encouraged offensive and abusive language, and lewd behavior by those senior employees who were welcomed into Defendants Schnatter and Ritchie's "inner circle."

45.     The 7/19/18 Article describes that there were incidents where "[f]emale employees were mocked and asked if they were menstruating."  In addition, Papa John's most senior executives are accused of making "references to 'gangbangs' and comments about whether women wanted 'to jump on the train.'"  *Forbes* also reported that three former employees said Defendant Ritchie was present when these comments were made and not only failed to put a stop to the antics, but would

encourage such behavior by laughing at the offensive remarks.  Indeed, according to former employees that spoke with *Forbes*, these offensive remarks were often made during management meetings that Defendant Ritchie was attending and when these remarks were made Ritchie would "just laugh along."

46.     Other crude accusations involved a senior male executive, Dustin Couts, who was a Director of Operations during the Class Period, discussing pornography with female subordinates and showing them inappropriate pictures on his cellphone.  This same executive is alleged to have asked a female colleague if she was menstruating after she disagreed with him.

47.     At an open Company meeting, Defendant Ritchie also reportedly referred to the Company's Operations Support and Training unit – the unit Dustin Couts was responsible for – as a "frat."

48.     Defendants' failure to address and condemn offensive remarks made by Papa John's executives helped foster a bro culture at the Company's headquarters, where male executives, who were members of Defendants Schnatter and Ritchie's inner circle, were supposedly encouraged to engage in this behavior and were often promoted to higher-ranking positions.  For example, the former President and Chief Development Officer of Papa John's International, Tim O'Hern ("O'Hern"), was an old childhood friend of Schnatter.  According to the 7/19/18 Article, while O'Hern was serving as the Company's Vice President in the mid-2000's, he was asked to resign after the Company began investigating his inappropriate behavior towards employees.  Despite this inappropriate behavior, in 2009, O'Hern found himself reinstalled within the Company's upper echelons as Senior Vice President of Development.  Amidst the scandal that embroiled the Company in July 2018 and while the audit of Papa John's culture was ongoing, the Company announced on a

Form 8-K filed with the SEC on September 5, 2018, that O'Hern was retiring from the Company "effective immediately."

49.     Defendant Schnatter himself ultimately admitted in a letter from his counsel, dated August 22, 2018, that there was "a toxic senior management culture, and serious misconduct at the top levels of our leadership team."  He went on to note that ***"[t]he source of the company's poor performance is rot at the top. The company's HR department has detailed evidence of sexual misconduct, harassment and intimidation by virtually everyone in [Ritchie's] inner circle, and relating to Board members as well***."[4]

50.     Though Defendant Schnatter was quick to expose the misconduct of other Papa John's executives, including Defendant Ritchie, it was reported that Schnatter's conduct was far from innocent during the Class Period.  During his time as CEO and/or Chairman of the Board, Schnatter has been accused of using his position of power to intimidate and harass female employees.  According to the 7/19/18 Article, a female employee reported that Schnatter "asked her bra size and whether she'd slept with her previous boss."

51.     Other incidents of Schnatter's' alleged misconduct include encouraging male executives to engage in inappropriate behavior or relationships with women other than their wives while at Company events and commenting on the attractiveness and weight of another male executive's wife.

52.     In the 7/11/18 Article, *Forbes* later revealed that the alleged toxicity of the work culture at Papa John's was not limited to the sexually inappropriate comments geared towards female employees.  Unbeknownst to investors, Defendant Schnatter, whose name and likeness were

---

[4]     http://savepapajohns.com/wp-content/uploads/2018/08/Franchisee-Letter-FINAL.pdf

the embodiment of the Company, had used a racial slur and made other offensive, racially-insensitive comments during a business conference call in May 2018.

53.     Despite these wide-spread issues, Defendants continued to falsely assure investors and employees that they "ha[d] the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards . . ." because the Company instituted and enforced the Code against all employees, including its officers and directors.

54.     This alleged pattern and practice of misconduct went on at the Company for years until July 2018, when the truth began to unravel.

**The #MeToo Movement**

55.     In October 2017, journalist Ronan Farrow published his groundbreaking article in *The New Yorker* revealing extensive sexual misconduct by film producer Harvey Weinstein.  The article is commonly believed to have ignited what is now known as the #MeToo movement.  The #MeToo movement began as an umbrella of solidarity on Twitter, helping to empower countless women to share their experiences of surviving sexual harassment or assault.  The #MeToo movement quickly gained momentum online with the help of various celebrities, and within a matter of days, an avalanche of sexual harassment accusations swept through varying industries within the country.

56.     Over the ensuing months (and continuing until today), the #MeToo movement has been responsible for ending the careers of a host of businessmen, news anchors, celebrities and politicians, as well as the filing of numerous legal complaints and charges of sexual harassment.

**Defendant Schnatter Is Ousted and Fights to Regain Control of the Company**

57.     Though Schnatter can be credited with taking a small pizzeria and turning it into a pizza empire, this was not enough to shield him from the consequences of his actions.  Beginning in November 2017, Schnatter found himself at the center of several public relations nightmares that

ranged from social faux pas to downright offensive transgressions.  As a result, Defendant Schnatter quickly fell from grace.

58.     On November 1, 2017, during an earnings conference call for investors and market analysts, Defendant Schnatter criticized NFL commissioner Roger Goodell for failing to resolve the controversy surrounding NFL players kneeling during the National Anthem as a form of protest (the "NFL Comment").  On the call, Defendant Schnatter commented as follows:

> Now to the NFL.  The NFL has hurt us.  And more importantly, by not resolving the current debacle to the player and owners' satisfaction, NFL leadership has hurt Papa John's shareholders.  Let me explain.  The NFL has been a long and valued partner over the years, but we are certainly disappointed that NFL and its leadership did not resolve the ongoing situation to the satisfaction of all parties long ago.  This should have been nipped in the bud 1.5 years ago.  Like many sponsors, we are in contact with NFL.  And once the issues is resolved between the players and the owners, we are optimistic that NFL's best years are ahead, but good or bad, leadership starts at the top.  And this is an example of poor leadership.

59.     Schnatter made these remarks because as the official pizza sponsor of the NFL, when the NFL's viewership was down as a result of the kneeling controversy, Papa John's pizza sales were also down.  The backlash in the media was instant and journalists recasted Schnatter's comments as racist and began accusing the Company of racism.  These reports were further disseminated on social media where customers vowed to boycott the Company.

60.     While its reputation was still on the mend as a result of the NFL Comment, *Forbes* published the 7/11/18 Article revealing that Defendant Schnatter used a racial epithet and made other disturbing racist comments, during a May 2018 conference call that, ironically, was for diversity sensitivity training.  The publication of the 7/11/18 Article sent the Company into a tailspin – the media and customers were swift to denounce the Company's sinking sales even lower than they already were.  Within hours of the 7/11/18 Article's publication, Papa John's announced that Defendant Schnatter had resigned from his position as Chairman of the Board.

61.     With the market was still reeling from Defendant Schnatter's use of a racial slur and other racially-biased comments, the 7/19/18 Article was published the following week, revealing that the inappropriate and offensive behavior was not just limited to Schnatter, but was widespread and rampant among Papa John's most senior executives.

62.     As if things were not chaotic enough within the Company following the two *Forbes* articles that exposed the Company's transgressions, just days after his resignation, Defendant Schnatter began reporting to the media that he regretted his decision to resign as Chairman of the Board and felt that his ousting was deliberately orchestrated by Defendant Ritchie and Ritchie's closest friends at the Company.  In a July 24, 2018 article entitled "Long Before His Racial Slur, Papa John's Founder Was at Odds With His Company," *The Wall Street Journal* reported that "Mr. Schnatter said he quickly came to regret his decision to step down as chairman and believed he was the right person to steer the company back to growth."

63.     In an effort to regain control of the Company and determine whether Defendant Ritchie organized the alleged *coup d'état*, on July 18, 2018, Defendant Schnatter, as a director and shareholder of the Company, made a demand on the Company's board of directors to examine records and documents related to his forced resignation pursuant to §220(d) of the General Corporation Law of Delaware.[5]

64.     After the board of directors rebuffed most of Schnatter's demands, on July 26, 2018, Schnatter filed a complaint in Delaware's Court of Chancery seeking to inspect Papa John's books and records (the "Delaware Litigation").  The Delaware Court of Chancery scheduled the matter for a one-day trial on October 1, 2018.  On January 15, 2019, the Delaware Court of Chancery ruled

---

[5]     http://savepapajohns.com/wp-content/uploads/2018/08/Papa-Johns-International-Document-Request-2018-07-18.pdf

largely in favor of Defendant Schnatter, granting him access to many of the documents he requested to inspect.

65.     While the Delaware Litigation was on-going, in an effort to rehabilitate his reputation, Defendant Schnatter created his own website called SavePapaJohns.com, where he posts press releases to franchisees, customers and investors describing the acrimonious rift that has grown between Schnatter and Ritchie.   In these letters and press releases, Schnatter lays blame for the Company's toxic culture and decreasing sales trend at Ritchie's feet.   In an effort to reflect the negative publicity from himself and onto Ritchie, Schnatter wrote in a letter to franchisees, stating in relevant part, as follows:

> This June, I told the Board that Steve [Ritchie] needed to go.  At the time, the Board agreed – and asked me to become Executive Chairman.
>
> Consistent with those discussions, I developed a detailed performance review for Steve, as his periodic evaluation was coming due, and I also identified a list of senior management to be replaced.  That list included Steve Ritchie.  It now appears that one of Steve's direct reports was having an affair with someone in our IT department, and she secretly accessed my draft review of Steve and shared those drafts with her "boyfriend" who then gave them to Steve.  Steve then decided, and communicated to others, that he needed to get rid of me to save his own job.

66.     Essentially, Schnatter alleges that he was overthrown because Ritchie "knew" that his job was in jeopardy because of the Company's sinking sales and, in an effort to save himself, Ritchie made Schnatter into a scapegoat.

67.     On his website, Schnatter also posts letters from his attorney and other legal documents related to the Delaware Litigation, in which he alludes to the misconduct within Papa John's senior management.   In an August 22, 2018 letter from Defendant Schnatter's attorney, Garland A. Kelley of Glaser Weil, Schnatter claimed to be aware of and documented **_numerous_**

*allegations of inappropriate conduct, including those sexual in nature, that Mr. Ritchie*
*emphatically does permit, condone and tolerate among his senior leadership team.*"[6]

68.     Accordingly, during the Class Period, Defendants knew, or recklessly disregarded, that Papa John's senior management was engaging in inappropriate and lewd behavior in the workplace that directly contradicted Defendants' representations that, among other things, the Company adhered to its policy of integrity, honesty, and inclusion that focused on putting team members first.  Moreover, by repeatedly choosing to speak about Papa John's commitment to its employees, high ethical standards and the strength of its corporate culture, Defendants assumed a duty to speak truthfully and fully on those topics.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD

### Papa John's Materially False and Misleading Code of Ethics

69.     Throughout the Class Period, Defendants assured investors that it enforced a strong culture of ethics and moral integrity.  To that end, the Company openly published the Code on its website,[7] promising that the Code applied to all employees, including those in the upper echelons of the Company.  In fact, in a letter-like preamble to the Code, which was signed by Defendant Ritchie, Ritchie stressed that while all employees were required to comply with the Code, "*[t]eam members*
*in leadership roles bear the additional responsibility of fostering a culture in which compliance*
*with policies, procedures, laws and regulations is a critical business activity*."

---

[6]      https://savepapajohns.com/wp-content/uploads/2018/08/Letter-Improper-Comments-By-The-Special-Committee-In-Support-Of-Company-Misconduct.pdf

[7]      Upon information and belief, the contents of the Code of Ethics and Business posted in the "Investor Relations" page of Papa John's website as of January 30, 2018, were similar in sum and substance throughout the Class Period.  *See* https://ir.papajohns.com/index.php/static-files/2f3a19d7-4de1-4dd3-b0fc-8cb32ffd13b1

70.     In the Code's preamble, Ritchie promised that employees had the "the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards. Our Code of Ethics and Business Conduct is an affirmation of our high ethical expectations . . . ."

71.     The preamble further noted that all employees "***must maintain the highest ethical standards in dealing with*** our customers, supply partners, ***fellow team members***, stockholders, and the press[,]"and that "[o]nly honest and ethical behavior will safeguard our reputation and the well-being of our company."  Ritchie went on to note that "***[w]e must govern our conduct and ourselves by the principles of honesty, fairness, mutual respect, trustworthiness, courage and personal and professional commitment***."

72.     Under the heading "Honesty and Fair Dealing[,]" the Code also required "[e]ach team member [to] strive to deal with . . . other team members on the basis of honesty, fairness, mutual respect and nondiscrimination."

73.     Among other things, the Code required the Company and its employees to comply with "all applicable labor and employment laws and regulations" so that employees could work in an environment "***that is free of harassment or other intimidating, hostile or offensive behavior based***" on, *inter alia*, a person's race or gender**.**

74.     The statements referenced above in ¶¶69-73 were materially false and misleading at the time they were made because Defendants knew, or recklessly disregarded, and/or failed to disclose:

(a)     that Papa John's did not provide its employees with an environment that was free of harassment and/or offensive behavior;

(b)     that the Company did not enforce the portions of the Code highlighted above;

(c)      that the Company and its leaders cultivated a hostile work environment against women that was rife was sexual harassment and other lewd behavior;

(d)      that the Company and its leaders projected a biased and/or racist image, which negatively impacted the Company's brand and reputation; and

(e)      in light of the public nature of some of the foregoing conduct, as well as the advancement of the #MeToo movement, such conduct would foreseeably have a negative impact on Papa John's business, sales and operations, harm the Company's reputation and ability to attract and/or maintain customers in North America, and expose the Company to significant legal liability.

### Materially False and Misleading Statements Made in the Company's SEC Filings, Press Releases, and on Investor Conference Calls

75.      The Class Period begins on February 25, 2014.  On that day, Papa John's filed an Annual Report on Form 10-K with the SEC, which was signed by Defendant Schnatter, and reported the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K").  The 2013 10-K stated that the Company had a good working relationship with its employees, stating in pertinent part:

> **Employees**[8] As of December 29, 2013, we employed approximately 20,700 persons, of whom approximately 18,000 were restaurant team members, approximately 900 were restaurant management personnel, approximately 700 were corporate personnel and approximately 1,100 were QC Center and Preferred personnel.  Most restaurant team members work part-time and are paid on an hourly basis.  None of our team members is covered by a collective bargaining agreement.  ***We consider our team member relations to be good.***

76.      The statement referenced above in ¶75 that "[w]e consider our team member relations to be good" was materially false and misleading because Defendants knew, or recklessly disregarded, that its "team member relations" were not "good" because the Company had instituted a

---

[8]      Emphasis in original.

toxic "frat club" work environment wherein employees were subject to sexual harassment, inappropriate innuendos and other offensive behavior.

77.     The 2013 10-K also emphasized the Company's commitment to its employees, stating in relevant part:

> ***Commitment to Team Member Training and Development.***[9]  ***We are committed to the development and motivation of our team members through training programs, incentive and recognition programs and opportunities for advancement***.  Team member training programs are conducted for corporate restaurant team members, and offered to our franchisees electronically and at training locations across the United States and internationally.  We offer performance-based financial incentives to corporate and restaurant team members at various levels.

78.     The statement in ¶77 that Papa John's is "committed" to the "motivation" of its employees was materially false and misleading for the reasons set forth above in ¶74.  Similarly, the statement regarding "opportunities for advancement" was materially false and misleading because the opportunities for advancement were based on being in the good graces of Defendants Schnatter and Ritchie, regardless of actual qualifications.

79.     The 2013 10-K further stated that "[w]e have adopted a written code of ethics that applies to our directors, officers and employees."

80.     The statement referenced above in ¶79 was materially false and misleading for the reasons set forth above in ¶74 and because by speaking about the Code, Defendants had an affirmative duty to speak fully and truthfully about it, including the knowing violations of the Code described herein.

81.     The Company also included similar misleading risk disclosures with respect to Defendant Schnatter.  In the 2013 10-K the Company warned that:

> Our business and brand may be harmed should the services of our Founder, John Schnatter, as Chief Executive Officer, Chairman or brand spokesman terminate for

---

[9]     Emphasis in original.

any reason.  Failure to effectively execute succession planning could harm our Company and brand.

John H. Schnatter, our Founder, Chairman and Chief Executive Officer, does not serve under an employment agreement and we do not maintain key man life insurance on Mr. Schnatter.  We also depend on the continued availability of Mr. Schnatter's image and his services as spokesman in our advertising and promotion materials.  While we have entered into a license agreement with Mr. Schnatter related to the use of certain intellectual property related to *his name, likeness and image, our business and brand may be harmed if Mr. Schnatter's services were not available to the Company for any reason or the reputation of Mr. Schnatter were negatively impacted.*  In addition, failure to effectively execute succession planning could harm our Company and brand.

82.     The statements referenced above in ¶81 regarding the reputation of Defendant Schnatter to the Company were materially false and misleading because, by speaking about Defendant Schnatter's reputation, Defendants were required to disclose that Defendant Schnatter was then-fueling a toxic workplace culture, including allegations of sexual harassment, which heightened the risk that his reputation and that of the Company would be harmed and the Company's ability to attract and retain customers would be significantly damaged.

83.     The statements referenced above in ¶¶75, 77, 79 and 81 from the Company's 2013 10-K were repeated or referred to, in all material respects, in the Company's Annual Reports on Forms 10-K for the years ended December 31, 2014 (the "2014 10-K"), December 31, 2015 (the "2015 10-K"), December 31, 2016 (the "2016 10-K"), and the 2017 10-K, all of which were signed by Defendant Schnatter, and were materially false and misleading for the same reasons as the 2013 10-K.  Defendant Ritchie also joined in signing the 2017 10-K.

84.     Additionally, the above statement in ¶79 that the Company "adopted a written code of ethics that applies to our directors, officers and employees" was repeated or referred to, in all material respects, in the Company's Definitive Proxy Statements filed on Schedule 14(A) on March 25, 2014, March 25, 2015, March 24, 2016, March 23, 2017, and March 28, 2018 and was materially false and misleading for the reasons set forth in ¶80.

85.     The 2013 10-K also contained a false and misleading risk disclosure about the importance of the Company's public perception, stating in relevant part:

> *Our success depends on the differentiation of our brand and maintaining the value and quality reputation of our brand, and any damage to consumers' perception of our brand may negatively impact our business and profitability.*[10]
>
> Our results depend upon our ability to differentiate our brand and our reputation for quality. Our brand has been highly rated in U.S. surveys and we strive to build the value of our brand as we develop international markets. ***The value of our brand and demand for our products could be damaged by incidents that harm consumer perceptions of the Company and our brand, such as product recalls, food safety issues, privacy breaches, and related negative publicity.*** Social media can be used to promote adverse consumer perceptions with significantly greater speed and scope than traditional media outlets. ***As a result, the value of our brand and the demand for our products could be damaged and have an adverse effect on our financial results.***

86.     The statement referenced above in ¶85 was materially false and misleading because it failed to disclose that the Company was then-fostering a toxic work culture rife with harassment and other biased behavior that, once revealed, would "harm consumer perceptions of the Company" which would significantly weaken the "value of [Papa John's] brand" "and have an adverse effect on [the Company's] financial results."

87.     The 2013 10-K misleadingly disclosed that the Company's failure to comply with relevant labor laws could harm the Company's reputation, stating in relevant part:

> We are subject to numerous laws and regulations governing our workforce and our operations. Changes in these laws, including health care legislation and minimum wage increases or additional laws could increase costs for our system-wide operations. . . . We operate in an increasingly complex regulatory environment, and the cost of regulatory compliance is increasing. ***Failure to comply*** with applicable ***U.S.*** and international ***labor***, health care, food, anti-bribery and corruption, consumer and other ***laws***, ***may result in civil and criminal liability, damages, fines and penalties. This could harm our reputation, limit our ability to grow and adversely affect our financial performance.***

---

[10]     Emphasis in original.

- 24 -

88.     The statements referenced above in ¶87 that Papa's John's "failure to comply" with federal labor laws could "result in civil and criminal liabilit[ies]" and that it could "harm our reputation, limit our ability to grow and adversely affect our financial performance" was materially false and misleading because Defendants knew, or recklessly disregarded, that it was then currently violating domestic labor laws in a manner that would ultimately harm its reputation and negatively impact sales for the reasons set forth above in ¶74.

89.     The statements referenced above in ¶¶85 and 87 from the Company's 2013 10-K were repeated or referred to, in all material respects, in the Company's 2014 10-K and were materially false and misleading for the same reasons.

90.     On May 6, 2014, Papa John's issued a press release announcing its financial results for the second quarter of 2014.  The next day, Papa John's held a conference call with analysts and investors.  The Individual Defendants participated on the call.  During the question and answer portion of the call, Defendant Schnatter made positive statements about the Company's executive management as follows:

**Michael Halen** - *Sidoti & Company - Analyst*

Very impressive comp store sales, gentlemen.  Can you give us any insight into what's driving the sharp acceleration?

**John Schnatter** - *Papa John's International, Inc. - Founder, Chairman & CEO*

This is John Schnatter.

Papa John's is functioning at an extremely high level and has been for some time. ***This leadership team and management team -- they understand the business model, they buy into the business model and they execute the business model at an extremely high level.  The success we're having today, we'll have tomorrow, are a result of the foundation and execution that we've laid the last five years.***

91.     The statement referenced above in ¶90 that Papa John's "leadership team and management team" "execute[d] the business model at an extremely high level" was materially false

and misleading when made because Defendants knew, or recklessly disregarded, that Papa John's management was not "execut[ing]" the business model.  To the contrary, Papa John's management had been accused by numerous employees of failing to execute its business strategy, specifically, its commitment to put team members first and to adhere to the policies set out in the Code.  This conduct would foreseeably have a negative impact on Papa John's business, sales and operations, harm the Company's reputation and ability to attract and/or maintain customers in North America, and expose the Company to significant legal liability.

92.     On November 4, 2014, Papa John's issued a press release announcing its financial results for the third quarter of 2014.  The next day, Papa John's held a conference call with analysts and investors.  The Individual Defendants participated on the call.  During the question and answer portion of the call, in response to an analyst's question about the Company's recent decision to hire its own in-house truck drivers, as opposed to outsourcing the drivers, Defendant Schnatter made additional positive statements about the Company's culture as follows:

> **The culture of Papa John's, really, is one that attracts really quality people.**  We've gone from where we were like 80 drivers short to where we now are 40 drivers over.
>
> We put an incentive in place for on-time, accurate deliveries and the drivers have embraced it.  The scores on the matrices for PJ food service are up like 30%, so it's been a really good thing.

93.     The statement referenced above in ¶92 that the "culture of Papa John's" "attracts really quality people" was materially false and misleading because Defendants knew or recklessly disregarded that the Company's "bro culture" cultivated a hostile work environment, which did not attract "quality people."

94.     On May 5, 2015, Papa John's issued a press release announcing its financial results for the first quarter of 2015.  The next day, Papa John's held a conference call with analysts and investors.  The Individual Defendants participated on the call.  During the question and answer

portion of the call, in response to an analyst's question about the Company's recent North American franchise revenues, Defendant Schnatter made additional positive statements about the Company's culture as follows:

> Alex this is John, getting back to getting better, ***I would be remiss if I didn't mention our culture. We just got rated as one of the best places to work in Kentucky, that's a couple years in a row, and I think that permeates throughout the rest of the organization.*** But Bob Smith has just really embraced the culture and ***people really like coming to work.***

95.    The statements referenced above in ¶94 regarding the Company's culture were materially false and misleading for the reasons set forth above in ¶74.

96.    On June 30, 2015, Papa John's issued a press release entitled "Papa John's Recognized for Its Industry Leading Customer Service and Trusted Reputation." The press release highlighted, among other things, the Company's commitment to its employees, stating in pertinent part:

> LOUISVILLE, Ky. – (BUSINESS WIRE) – Papa John's is once again a pizza category leader in customer satisfaction among limited-service restaurants, according to the 2015 American Customer Satisfaction Index (ACSI) released today. The Louisville-based pizza chain earned the highest rating among pizza chains for the 14th time in the past 16 years.
>
> ***"Our team lives by the acronym 'PAPA,' or 'People Are Priority Always,'"*** *said John Schnatter, Papa John's founder, chairman, CEO and president.* ***"These honors are a testament to putting people first. Our people are the heart and soul of this company. When we take care of our people, they take care of our customers, and happily go the extra mile to deliver on our promise of 'Better.'"***
>
> \*        \*        \*
>
> In addition to the recognition from ACSI, Papa John's was ranked ninth among quick-service restaurants and thirteenth among hospitality providers in the 2015 U.S. Hospitality & Travel RepTrak Report, a report from the Reputation Institute that ranks companies based on their reputation. ***Citing the report findings, vice president and chief research officer, Brad Hecht, noted that the company was perceived as having "incredibly strong" corporate leadership, particularly from Schnatter who "is viewed as very authentic."*** Papa John's was the only pizza company that placed in the top ten rankings, which were compiled from survey data of 27,000 to 28,000 participants representing the general United States population.

- 27 -

97.     The statements referenced above in ¶96 regarding the Company's "people" and its leadership were materially false and misleading for the reasons set forth above in ¶74.

98.     On June 21, 2016, Papa John's issued a press released entitled "Papa John's Leads the Pizza Category in Customer Satisfaction and Product Quality" where Defendant Schnatter again highlighted the Company's commitment to its employees stating:

> At Papa John's, it all comes down to better ingredients - ***and our most important ingredient is our people. We take care of our people***, who in turn go above and beyond to take care of customers.  This simple, yet winning formula works because we are never satisfied with good enough," said "Papa John" Schnatter, Founder, Chairman and CEO of Papa John's International.  "From employee development, such as our 'Driver to CEO' program, to the Clean Label initiative, ***Papa John's is committed every day to providing a better experience for our team member*** [*sic*] and customers.

99.     The statements referenced above in ¶98 that the Company's "most important ingredient is [its] people" and that the Company "take[s] care of [its] people" and is "committed every day to providing a better experience for [employees]" were materially false and misleading for the reasons set forth above in ¶74.

100.     On August 3, 2016, Papa John's hosted an earnings conference call for analysts, media representatives and investors to discuss Papa John's financial results and operations for the second quarter of 2016.  The Individual Defendants participated on the call.  Defendant Ritchie touted the Company's culture and its commitment to its employees.  Defendant Ritchie stated in relevant part:

> But one of the biggest reasons for our success for over three decades has been our focus on delivering not only better pizza, but a better experience to our customers. ***Our people-powered strategy has developed a passionate culture throughout the brand that has inspired our team members to strive for excellence with each and every customer interaction***.  As John mentioned earlier, Papa John's was recently ranked number one in customer satisfaction by the American Customer Satisfaction Index for the 15th time in the past 17 years.  This is a tremendous accomplishment validating our brand promise and unwavering focus on quality and consistency.

101.     The statement referenced above in ¶100 that the Company developed a "passionate culture" that "inspired" the Company's employees was materially false and misleading for the reasons set forth above in ¶74.

102.     On February 22, 2017, Papa John's hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and operations.  The Individual Defendants participated on the call.  Defendant Schnatter once again lauded Papa John's commitment to its employees, stating that the Company's recent media campaign "highlights our most important ingredient, our people."  Defendant Ritchie also spoke on the topic, stating:

> From our humble beginnings in a broom closet back in 1984, *our primary source can be attributed to – our success can be attributed to our most important ingredient, as John stated, our people.*  At Papa John's, we're more than a pizza company; we are a pizza family.  *We believe our continuous commitment to enhance culture and quality will further differentiate our premium brand from the rest of the industry.*
>
> \*     \*     \*
>
> In closing, we are very proud of our 2016 global comp sales results, our strong unit growth and 22% EPS growth.  *In addition to our efforts on* new products like pan pizza, leadership in technology, Clean Label and *improving our customer experience through our culture-first approach, we continue to live out our promise of better ingredients, better pizza.*  With that, I'll turn it back over to Lance for questions.

103.     During the question and answer portion of the call, Defendant Schnatter told investors that "[t]he fundamentals of the Company have never been better.  Our food, our pizza scores, our service*, our culture is at an all-time high*."

104.     The statements referenced above in ¶¶102-103 were materially false and misleading for the reasons set forth above in ¶74.

105.     Then, on December 18, 2017, Papa John's issued a press release entitled "Papa John's Promotes Steve Ritchie to CEO."  In the press release, Papa John's announced that Schnatter was

resigning from his position as the Company's CEO and that Ritchie was to become Schnatter's

replacement.  In announcing Ritchie's appointment, the press release stated:

> As Chief Executive Officer, Mr. Ritchie will lead Papa John's global development
> and facilitate the brand's marketing, digital and customer experience evolution.
> Recent hires of Mike Nettles as Chief Information and Digital Officer, Brandon
> Rhoten as Chief Marketing Officer and the addition of a digital-first creative agency
> of record, Laundry Service, underpin the brand's emphasis on digital marketing and
> technology.  ***But the company's primary focus will be on its team members.***

> "I am humbled to take on this role," said Ritchie.  "***By focusing on our team
> members, we will deliver the world class experiences our customers deserve***.  At
> Papa John's, any opportunity is achievable if you dedicate yourself to putting your
> best foot forward every day.  I'm certain our future company leaders are delivering
> pizzas in one of our 5,000 stores around the world right now."

106.    The statements referenced above in ¶105 that under Ritchie's leadership "the

company's primary focus will be on its team members" and that the Company would be "focusing

on [its] team members" were materially false and misleading for the reasons set forth above in ¶74.

107.    Shortly thereafter, on December 22, 2017, the online journal *Louisville Business First*

published an article entitled "Read the letter Papa John's new CEO wrote to employees,

franchisees."[11]  The article published an open letter that Defendant Ritchie wrote to Papa John's

employees and franchisees, emphasizing the importance of a healthy culture within Papa John's.

The article stated, in relevant part:

> For the last 21 years, no matter if I was working in customer service, as a delivery
> driver, in ops, as a franchisee, or serving as your COO and President, ***I knew John's
> People Are Priority Always principle was the guiding force that led to our success***.
> Our drive in 2018 will be based on this principle, along with the tenets of Go Left,
> because happy people make better pizza!

> At Papa John's, any opportunity is achievable if you commit to putting your best foot
> forward every day.  ***As John always says, our most important ingredient is our
> people!  An inspired culture will always be our most competitive differentiation.***

---

[11]     https://www.bizjournals.com/louisville/news/2017/12/22/read-the-letter-papa-john-s-new-
ceo-wrote-to.html?s=print

108.    The statements referenced above in ¶107 regarding the Company's people and its culture were materially false and misleading for the reasons set forth above in ¶74.

109.    On February 27, 2018, the Company filed its 2017 10-K with the SEC. The 2017 10-K misleadingly warned investors that the "[f]ailure to preserve the value and relevance of our brand could have a negative impact on our financial results." The Company went on to note that:

> Our results depend upon our ability to differentiate our brand and our reputation for quality. Damage to our brand or reputation could negatively impact our business and financial results. Our brand has been highly rated in U.S. surveys, and we strive to build the value of our brand as we develop international markets. The value of our brand and demand for our products could be damaged by any incidents that harm consumer perceptions of the Company.
>
> **To be successful in the future, we believe we must preserve, enhance and leverage the value of our brand. Consumer perceptions of our brand are affected by a variety of factors,** such as the nutritional content and preparation of our food, the quality of the ingredients we use, **our business practices** and the manner in which we source the commodities we use. Consumer acceptance of our offerings is subject to change for a variety of reasons, and some changes can occur rapidly. Consumer perceptions may also be affected by third parties presenting or promoting adverse commentary or portrayals of our industry, our brand, our suppliers or our franchisees. **If we are unsuccessful in managing incidents that erode consumer trust or confidence, particularly if such incidents receive considerable publicity or result in litigation, our brand value and financial results could be negatively impacted.**

110.    The statements referenced above in ¶109 regarding "[c]onsumer perceptions of [Papa John's] brand" were materially false and misleading because Defendants knew, or recklessly disregarded, and/or failed to disclose: (i) that Papa John's most senior employees, including the Individual Defendants, had engaged in or condoned sexual harassment and/or other inappropriate workplace conduct at the Company; (ii) that the conduct of these senior executives violated Papa John's Code and created a hostile work environment; and (iii) that the foregoing conduct would negatively impact Papa John's business, sales and operations, and expose Papa John's to reputational harm and legal liability.

111.    The 2017 10-K also contained the following risk disclosure:

- 31 -

Changes in consumer preferences and trends (for example, changes in consumer perceptions of certain ingredients that could cause consumers to avoid pizza or some of its ingredients in favor of foods that are or are perceived as more healthy, lower-calorie or otherwise based on their ingredients or nutritional content) or preferences for a dining experience such as fast casual pizza concepts, could adversely affect our restaurant business and reduce the effectiveness of our marketing and technology initiatives. ***Also, our success depends to a significant extent on numerous factors affecting consumer confidence and*** discretionary consumer income and spending, such as general economic conditions, ***customer sentiment*** and the level of employment. Any factors that could cause consumers to spend less on food or shift to lower-priced products could reduce sales or inhibit our ability to maintain or increase pricing, which could materially adversely affect our operating results.

112.    The statements referenced above in ¶110 regarding the factors that affect the Company's success were materially false and misleading for the reasons set forth above in ¶74.

113.    That same day, Papa John's also issued a press release entitled "Papa John's Announces Fourth Quarter 2017 Results and Provides 2018 Outlook." In the press release, Papa John's and Defendant Ritchie highlighted their renewed commitment to improving the Company's reputation and the steps it was taking to increase the Company's revenue, which had slumped during the previous fiscal year. The press release stated in relevant part:

> ***We know our potential is so much greater than our results, and we are taking significant steps to reinvigorate our record of profitable growth and value creation,"*** said Steve Ritchie, CEO and President of Papa John's. ***"Actions are underway to improve our brand proposition, how we connect with customers, and how we operate at the unit level.*** These actions build on all the strengths of the Papa John's brand and include a fresh perspective around marketing driven by new media and creative partnerships, hiring a new PR partner, and bringing online a new engine to drive our Papa Rewards loyalty system. ***Based on these initiatives, we expect to see marked improvements in sales later in 2018.*** Our franchise partners in the US are fully aligned with our initiatives and are excited about this next chapter of the Papa John's brand.

114.    The statements referenced above in ¶113 that "[a]ctions are underway to improve [Papa John's] brand proposition," "how we connect with customers" and that "[b]ased on these initiatives, we expect to see marked improvements in sales later in 2018" were materially false and misleading for the reasons set forth above in ¶74.

115.     Papa John's also hosted an earnings conference call that day for analysts, media representatives and investors to discuss the Company's financial results and operations.   While trying to falsely reassure investors that the Company was reformulating its culture and business strategy to improve revenues, Defendant Ritchie stated as follows:

> Fifth, we will invest in our most important ingredient, our people, because I know *the strength of our culture will determine the success of our strategy*.   To be clear, it is not business as usual, at Papa John's.   *We are taking important actions in each of these areas to drive improved performance and value creation*.

116.     The statements referenced above in ¶115 regarding the strength of the Company's culture and the actions being taken to drive improved performance were materially false and misleading for the reasons set forth above in ¶74.

117.     On May 8, 2018, the Company hosted another earnings conference call for analysts, media representatives and investors.   During the question and answer portion of the conference, Defendant Ritchie misled investors to believe that the Company was committed to repairing its reputation that had deteriorated as a result of the NFL Comment, stating in relevant part:

> **Christopher Thomas O'Cull -** *Stifel, Nicolaus & Company, Incorporated, Research Division - MD & Senior Analyst*
>
> Can we expect some other messages or significant changes over the next couple of quarters to address some of the reputation issues?
>
> **Steve M. Ritchie -** *Papa John's International, Inc. - President & CEO*
>
> I certainly think you can.  We just hired a new public relations agency.  They came in, in February, Olson Engage, and we do have a strategic plan that we intend to implement.  We've got a number of tactical things that we've already started on. Bigger initiatives will progress as we move throughout the year.  And we're very optimistic about how those things will move the overall business forward.  But you got to do the work.  You got to be out in the communities and sharing the things that Papa John's does right, and we've got 3,400 restaurants in the U.S. and that's made up of many franchisees and over 100,000 team members in the U.S., 120,000 worldwide.  So we've got to share those stories and do the right things and one customer at a time.  *I'm very confident the business will come back, and we have a very, very strong brand* that is still very young compared to our competitors in this

category. ***So the future is bright domestically***, and the international story is one that clearly has got a lot of, lot of runway.

118.    The statements referenced above in ¶117 regarding the strength of the Company's brand and Ritchie's confidence in the business coming back were materially false and misleading for the reasons set forth above in ¶74.

### The Toxic Culture Inside Papa John's Slowly Comes to Light

119.    On July 11, 2018, *Forbes* publishes an article entitled "Papa John's Founder Used N-Word On Conference Call."  Ironically, the incident occurred during a sensitivity training conference call that Defendant Schnatter was participating in to prevent him from creating further public relations crises following the turmoil of the NFL Comment.  According to *Forbes*:

> John Schnatter – the founder and public face of pizza chain Papa John's – ***used the N-word on a conference call in May. Schnatter confirmed the incident in an emailed statement to Forbes on Wednesday.***  He resigned as chairman of Papa John's on Wednesday evening.
>
> The call was arranged between Papa John's executives and marketing agency Laundry Service.  It was designed as a role-playing exercise for Schnatter in an effort to prevent future public-relations snafus.  Schnatter caused an uproar in November 2017 when he waded into the debate over national anthem protests in the NFL and partly blamed the league for slowing sales at Papa John's.
>
> On the May call, Schnatter was asked how he would distance himself from racist groups online.  He responded by downplaying the significance of his NFL statement.  "Colonel Sanders called blacks [the N-word]," Schnatter said, before complaining that Sanders never faced public backlash.
>
> Schnatter also reflected on his early life in Indiana, where, he said, people used to drag African-Americans from trucks until they died.  He apparently intended for the remarks to convey his antipathy to racism, but multiple individuals on the call found them to be offensive, a source familiar with the matter said.
>
> \*     \*     \*
>
> ***In an emailed statement on Wednesday afternoon, Schnatter confirmed the allegations. "News reports attributing the use of inappropriate and hurtful language to me during a media training session regarding race are true," he said.***
>
> \*     \*     \*

- 34 -

The NFL incident forced Schnatter to lie low, and Papa John's diminished his prominence in advertisements. That change did not sit well with Schnatter. He personally hired a marketing agency (not Laundry Service) to create ads featuring him that would air in key markets, a source close to the company told *Forbes*. Then, in May, he pushed out Papa John's CMO Brandon Rhoten, who lobbied to keep Schnatter off the airwaves, multiple insiders say. With Rhoten gone, Papa John's tasked Laundry Service with helping to manage Schnatter's comeback.

120.    Defendants knew, or could have reasonably expected, that this incident would become public knowledge, and once revealed, would negatively affect consumer sentiment in a way that would adversely impact the Company's operations and revenue because it did not occur during a private phone call, but rather, on a phone call with a marketing company that was specifically hosting the conference call to train Defendant Schnatter on this precise issue.

121.    In response to this news, the price of Papa John's common stock fell from a closing price of $50.79 per share on Tuesday, July 10, 2018, to close at $48.33 per share on Wednesday, July 11, 2018 – a decline of 5.1%.

122.    The same day that the 7/11/19 Article was published, Defendant Schnatter resigned as Chairman of the Board.

123.    On Sunday, July 15, 2018, Papa John's announced that it had created a special committee of the Board to "evaluate and take action with respect to all of the Company's relationships and arrangements with John H. Schnatter." The press release also announced that it specifically prohibited Defendant Schnatter from speaking on behalf of the Company and that the Company had terminated "Schnatter's Founder Agreement, which defined his role in the company, among other things, as advertising and brand spokesperson for the company." The press release also stated that the special committee voted to "terminate a sublease agreement granting Mr. Schnatter the right to use certain office space at the company's corporate headquarters in Louisville, Kentucky."

124.    The market reacted negatively to this news, with shares of Papa John's declining from a close of $53.55 per share, on Friday, July 13, 2018, to close at $51.41 per share on Monday, July 16, 2018 – a decline of 4%.

125.    Two days later, on July 17, 2018, the special committee announced that it had retained the law firm Akin Gump Strauss Hauer & Feld LLP to audit and investigate Papa John's "processes, policies and systems related to diversity and inclusion, supplier and vendor engagement and Papa John's culture."

126.    Following the 7/11/18 Article, things only went from bad to worse for the Company. Just eight days later, *Forbes* published the 7/19/18 Article. The 7/19/18 Article described the alleged lewd, repugnant culture inside Papa John's that went much further than the racist remarks made by Defendant Schnatter. The article described:

> Based on interviews with 37 current and former Papa John's employees—including numerous executives and board members—Schnatter's alleged behavior ranges from spying on his workers to sexually inappropriate conduct, which has resulted in at least two confidential settlements.

> \*       \*       \*

> ***Under Ritchie's and Schnatter's watch, multiple insiders describe a laundry list of transgressions: Female employees were mocked and asked if they were menstruating. Male executives made references to "gangbangs" and comments about whether women wanted "to jump on the train." Three former employees say Ritchie was present when these types of remarks were made and just laughed along.***

> \*       \*       \*

> One former executive says the married Schnatter would disappear for days on work trips, stirring suspicion that he was "hooking up with girls." (Schnatter denies this.) In 1999, a mobile phone representative named Lesli Workman filed a lawsuit alleging that Schnatter groped her after meeting her at a party in a Louisville park, proceeded to stalk her, then asked her boss to send her to Papa John's to discuss a possible phone contract. Schnatter denied the allegations and filed a counterclaim alleging that she tried to extort $5 million from him and Papa John's. The case ended with a confidential settlement.

*     *     *

Over time, Schnatter . . . allegedly recruited Papa John's employees to spy on their colleagues.  He read workers' emails, according to two sources with knowledge of the episodes, and sometimes conducted business from disposable phones.

*     *     *

Just after reclaiming CEO duties, Schnatter attended the NCAA Final Four in Detroit.  During the trip there was an incident with a 24-year-old female Papa John's marketing employee that resulted in a second confidential settlement and the employee's swift departure.  Three sources tell Forbes they know of additional settlements between Schnatter and women involving inappropriate conduct, though details could not be confirmed by publication time.  (Schnatter disputes this.)

**A female employee says that Schnatter asked about her bra size and whether she'd slept with her previous boss, and that he never let her pass in a hall without giving her a hug.**  (He denies this.)  A male executive recalls going out to dinner with his wife and bumping into Schnatter at the bar.  Schnatter allegedly told the executive that he "had a cute wife, if she'd lose some weight."

*     *     *

**Ritchie's [appointment as COO and President intensified the harassment].  "The longer he was in that position, the more rapidly the culture declined," says a recently departed executive.  At company off-sites, execs made their crudest jokes, the ones about "gangbangs" and women wanting to "jump on the train."**

. . .  Multiple sources say meetings were filled with profanity and inappropriate comments.  Ritchie allegedly never intervened.  "These things would happen in meetings and conference rooms and whatever.  Steve would just laugh.  He would just laugh," says an individual present during such incidents.

**The conduct of Dustin Couts, a longtime operations leader and close friend of O'Hern's, is one example, three sources say.  In one alleged instance, he discussed porn with a female junior employee, one source says; in another he showed inappropriate images to colleagues on his cell phone; in yet another he asked a coworker if she was on her period after she disagreed with him. . . .[12]**

**Ritchie allegedly knew of these types of improprieties. . . . The culture impacted the business.**

---

[12]    Further disturbing and explicit alleged misconduct by Dustin Couts is described in the article and incorporated by reference herein.

127.    In light of the #MeToo movement that was flourishing during the time that Defendants knew their misconduct had occurred, Defendants knew, or could have reasonably expected, that their misconduct would become public knowledge, and once revealed, would negatively affect consumer sentiment in a way that would adversely impact the Company's operations and revenue.

128.    Upon learning of the alleged toxic culture created by Papa John's management, the price of Papa John's common stock fell from a closing price of $53.10 per share on Wednesday, July 18, 2018, to close at $50.52 per share on Thursday, July 19, 2018 – a decline of 4.9%.

129.    On that following Sunday, July 22, 2018, the Papa John's Board of Directors voted to adopt a "poison pill" to prevent Defendant Schnatter from gaining a controlling interest in the Company.  The Company formally announced the decision in a press release on Monday, July 23, 2018.

130.    Following this news, the price of Papa John's common stock took another tumble, falling from its closing price of $51.59 per share on Friday, July 20, 2018, to close at $46.56 per share on Monday, July 23, 2018 – a decline of 9.7%.

131.    The market was surprised by this latest move, with Tuna Amobi from the Center for Financial Research & Analysis LLC stating:

> We cut '18 and '19 EPS estimates by $0.14 and $0.37 to $2.23 and $2.44.  This comes after a very tumultuous month in July during which PZZA took some dramatic actions to cut ties with its founder, John Schnatter.  Soon afterward (also in July), the company instituted a "poison pill" via certain rights issues as a potential takeover deterrent, which we think has some negative implications for corporate governance.

132.    Then, amidst the negative publicity, on August 7, 2018, Papa John's released its financial results for the second quarter of 2018  Not only did Papa John's sales suffer once the truth about its culture was disclosed but the Company finally admitted in its quarterly report for the period

ended July 1, 2018 on Form 10-Q (the "2Q18 10-Q") that it would be required to spend an estimated

*$30-50 million* to repair its now-sullied reputation.  The 2Q18 10-Q stated:

> The Company also expects to incur significant costs as a result of the recent events that include, but are not limited to, the following:
>
> - re-imaging costs at nearly all domestic and international restaurants,
>
> - costs to accelerate our replacement of certain branded assets and related marketing efforts,
>
> - financial assistance to domestic franchisees, such as short-term royalty reductions, in an effort to mitigate closings,
>
> - additional costs for branding initiatives, including but not limited to, launching a new advertising and marketing campaign and promotional activities to mitigate negative consumer sentiment and negative sales trends,
>
> - costs associated with a third-party audit of the culture at Papa John's commissioned by the Special Committee as well as costs associated with implementing new policies and procedures to address any findings as a result of the audit, and
>
> - additional legal and advisory costs, including costs associated with the activities of the Special Committee.
>
> The Company is still gathering information regarding these costs but has developed a preliminary range of $30 million to $50 million for the remainder of 2018.

133.   On that same day, Papa John's issued a press release entitled "Papa John's Announces Second Quarter 2018 Results and Updates 2018 Outlook."  The press release further revealed the extent of the damage.  Investors learned that adjusted earnings per diluted share decreased *24.6%,* slumping to $0.49 in 2Q18 from $0.65 in the second quarter of 2017.  The press release also revealed that consolidated revenues decreased *$26.8 million* or *6.2%*.  Additionally, Papa John's was forced to revise its 2018 outlook and lower its adjusted earnings per share *38.6%*, to $1.30 from $1.80, due to the negative sales trends.  Acknowledging just how bad things had become for the Company and the failures in its culture, Defendant Ritchie stated in the press release as follows:

"Earlier this year, we began implementing key changes in how we operate and market our products to refocus on quality and better connect with customers," said Steve Ritchie, President and CEO of Papa John's.  "While results have been challenged by recent events, we are committed to these strategic priorities and continue to believe that they will lead to enhanced performance.

We have also begun an external audit of Papa John's culture and will address any improvements that are recommended at its conclusion.  ***Our entire leadership team understands the importance of getting our culture and business improvements right***.  We have important work ahead of us, and I feel certain that with the collective efforts of our 120,000 corporate and franchise team members that the best days for Papa John's are ahead."

134.     On August 7, 2018, after the market had closed, Papa John's hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and operations.  On the call, Defendant Ritchie finally revealed that the Company's culture needed a significant facelift, stating in pertinent part:

Now, moving to the progress report for 5 strategic initiatives that we announced earlier this year.  First, making people a priority.  I have said it countless times, our most important ingredient is our people.  We have 120,000 corporate and franchise employees, and they are outstanding people, dedicated to the company's success. ***Recognizing recent events, we realized that we need to do more to put our best foot forward and ensure we are doing right by all members of the Papa John's family. We recently promoted Victoria Russell to become the first Chief of Diversity, Equity & Inclusion for the Papa John's International.***  Victoria has been instrumental in forming and leading our diversity and inclusion committee beginning late last year and has shown tremendous passion for the brand.  Victoria will be leading efforts that ensure our company's commitment to diversity and inclusion, remains a top strategic priority across all aspects of our business operations. ***Consistent with this commitment, we've also engaged [ph] NIMBUS as our multicultural agency of record to help us further align our internal and external [Diversity and Inclusion] efforts on the communication strategy.***

Second, improving our brand differentiation.  ***Our work to drive new branding and marketing campaigns that differentiate Papa John's and refocuses on our value proposition is more important now than ever as we try to reestablish trust with our customers.  Moving forward, these efforts will take into account what consumers, in particular millennials and Gen Z consumers, expect from a business, including their expectations that companies have an active role in making the world a better place.***

*         *         *

- 40 -

Our franchisees and team members continue to work hard and demonstrate their dedication and attention to quality every day. ***But we have to be more than a product and an experience to be relevant to the consumers we have lost. And the consumers who simply felt we weren't for them.*** Last week, we engaged a new marketing partner, Endeavor Global Marketing, to assist us to get the right message to re-engage with our customers. ***Together, we are focused on ensuring that our marketing underscores that our "better pizza and better ingredients" mantra is tied to the steps we are taking towards becoming a purpose-driven company.*** We are confident that Endeavor is the right partner for us as they will provide not only creativity and content, but a unique position as a cultural marketing agency that can take our core brand DNA and marry it with their influence, access and activation expertise to craft our way forward. You'll begin to see their work come to life in Q4.

135.   Later on the call, Joseph Smith, the Company's Chief Financial Officer, reiterated that the Company was lowering its 2018 earnings forecast and that "[t]he change in assumptions are as follows: We're forecasting North America comparable sales of ***negative 7% to negative 10% for the full year***, taking into account the significant and negative impact of the July 11 media coverage and the continued media coverage."

136.   On that same day, following the Company's release of its dismal 2Q18 results, Defendant Schnatter chimed in through a statement posted on SavePapaJohn's.com, stating in relevant part:

> As I communicated to the Board as early as December 2016 and several times in 2017, I am seriously concerned about the Company's declining sales, financial performance and, most importantly, the direction the Company headed under the stewardship of Steve Ritchie and the current board of directors. The financial results announced today further exemplify that concern.[13]

137.   Following the August 7, 2018 announcements, analysts issued reports over the next few days reflecting the Company's reputational damage. For example, a Stephens, Inc. report noted that "the Company needs to aggressively present a refreshed brand message and image, along with a more sustainable value strategy to improve consistency of PZZA's volatile top line."

---

[13]   https://savepapajohns.com/papa-johns-founder-john-schnatter-issues-statement-on-company-2nd-qtr-results-2018-08-07/

138.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

### Post-Class Period Events

139.    In an August 22, 2018 letter from Defendant Schnatter's attorney, Garland A. Kelley of Glaser Weil, to Douglass B. Maynard of Akin Gump Strauss Hauer & Feld LLP and Mr. John B. Beckman of Hogan Lovells US LLP, counsel to Papa John's, Mr. Kelley wrote:

> In the Company Statement, it notes that while Mr. Ritchie purportedly "does not permit, condone or tolerate any form of harassment or sexism in the workplace or at work-related functions," it also states that the Special Committee is conducting an audit and investigation "related to diversity and inclusion" and "Papa John's culture."
>
> Simultaneously, Special Committee Statement emphasized that "the independent directors support Steve [Ritchie and his] leadership team."
>
> These comments are profoundly troubling, and further call into question the purported "independence" of the Special Committee. *As an initial matter, Mr. Schnatter's letter to the Company's Human Resources department, dated August 17, documents numerous allegations of inappropriate conduct, including those sexual in nature, that Mr. Ritchie emphatically does permit, condone and tolerate among his senior leadership team.* It is simply inappropriate for the Special Committee - before conducting any investigation whatsoever into those allegations - to immediately announce that it has *pre-judged*[14] the matter and confirm that Mr. Ritchie has the "support" of each member of the Special Committee.[15]

140.    Other sources also reported that Defendant Ritchie knew of the inappropriate behavior transpiring within the Company.  On August 18, 2018, *Forbes* published yet another article outlining the misconduct that employees alleged were occurring within the Company.  The article,

---

[14]    Emphasis in original.

[15]    https://savepapajohns.com/wp-content/uploads/2018/08/Letter-Improper-Comments-By-The-Special-Committee-In-Support-Of-Company-Misconduct.pdf

entitled "Tensions High At Papa John's, Even With Founder Gone" stated that "five current and former workers say [Ritchie] knew of misconduct but did not act."[16]

141.    The following week, Defendant Schnatter posted an open letter to Papa John's franchisees on his website SavePapaJohns.com.[17]  In the August 27, 2018 letter, Defendant Schnatter again acknowledged the transgressions occurring within the highest levels of the Company, while trying to deflect the blame from himself.  In his letter, Defendant Schnatter stated:

> Bad financial decisions, insufficient management skills to correct them, ***a toxic senior management culture, and serious misconduct at the top levels of our leadership team*** have prompted some in the company to use me as an excuse to distract from those cold realities.
>
> *              *              *
>
> ***The source of the company's poor performance is rot at the top.  The company's HR department has detailed evidence of sexual misconduct, harassment and intimidation by virtually everyone in [Ritchie's] inner circle, and relating to Board members as well.***

142.    The fallout from Defendants' misconduct was devastating.  As a result of the negative media coverage, the Company:

- Adjusted earnings per diluted share decreased 24.6% slumping to $0.49 in 2Q18 from $0.65 in the second quarter of 2017;

- Consolidated second quarter revenues decreased $26.8 million or 6.2%;

- Was forced to revise its 2018 outlook, lowering its adjusted earnings per share 38.6% to $1.30 from $1.80;

- Lost its partnership with the NFL;

- Lost its partnership with Major League Baseball;

---

[16]    Noah Kirsch, "Tensions High At Papa John's, Even With Founder Gone," FORBES (Aug. 18, 2018, 8:00 a.m.), https://www.forbes.com/sites/noahkirsch/2018/08/17/troubled-culture-remains-at-papa-johns-even-with-founder-gone/#703b44876432

[17]    https://savepapajohns.com/johns-letter-to-the-franchisees/

- Papa John's name was removed from the University of Louisville football stadium;

- The Company has had to expend significant sources toward rebranding and rehabilitating Papa John's reputation, including a half-million dollar donation to Bennett College, a historically black college for women;

- The Company is spending millions of dollars in legal and auditing fees;

- Papa John's was forced to slash franchisee royalty reductions, in an effort to mitigate store closings; and

- The Company required a $200 million cash infusion from private investor, Starboard Value LP.

143.    In fact, on November 6, 2018, Papa John's hosted an earnings conference call with analysts, media representatives and investors to discuss the Company's financial results and operations for the third quarter of 2018.  On the call, the Company revealed that the potential $30 to $50 million in future costs that it expected to incur as a result of the negative media coverage would actually be increased to *$50 to $60 million*.

144.    Recognizing just how deep the issues within the Company ran, in addition to naming Victoria Russell as the Company's first Chief of Diversity and Inclusion, on January 23, 2019, the Company announced that it had also appointed Marvin Boakye as its first Chief of People Officer because "Boakye's expertise will help [the Company] to continue to push Papa John's forward in [its] transformation to become a better place to work for our 120,000 corporate and franchise team members[.]"

## PAPA JOHN'S FAILED TO DISCLOSE MATERIAL INFORMATION IT HAD A DUTY TO DISCLOSURE PURSUANT TO ITEMS 303 AND 503

### Item 303

145.    The SEC created specific rules governing the content of disclosures by public companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and

Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

146.    Specifically, Item 7 of Form 10-K and Item 2 of Form 10-Q require that a company's SEC filings furnish the information required under Item 303(a)(3) of Regulation S-K. Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC, among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

147.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

148.    Defendants violated the affirmative disclosure duties imposed by Item 303(a)(3) of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, in the Company's Forms 10-Q and 10-K filed during the Class Period, that senior executives at Papa John's fostered a toxic culture of sexual harassment and other inappropriate behavior that harmed the Company's ability to attract and/or retain employees and customers, which was a trend known to

management that was reasonably expected to have a material unfavorable impact on net sales or revenues or income from continuing operations.

149.    The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations[.]"

**Item 503**

150.    Defendants also violated their affirmative disclosure duties imposed by Item 503(c) of Regulation S-K, 17 C.F.R. §229.503(c), which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk." Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S-K," codified at 17 C.F.R. §229.503(c). Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

151.    Defendants violated the affirmative disclosure duties imposed by Item 503 of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose the significant risk that the toxic culture of sexual harassment and other inappropriate and biased behavior by senior executives of Papa John's – which was likely to become public in light of the #MeToo movement and the fact that racist comments were made on a conference call with multiple attendees – would harm the Company's ability to attract and/or retain customer loyalty, thereby making an investment in Papa John's increasingly risky or speculative.

### ADDITIONAL SCIENTER ALLEGATIONS

152.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Papa John's, their control over, and/or receipt and/or modification of Papa John's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Papa John's, were active and culpable participants in the fraudulent scheme alleged herein.

153.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

154.     The Individual Defendants, because of their positions with Papa John's, controlled the contents of the Company's public statements during the Class Period.  The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Papa John's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

155.     The scienter of the Individual Defendants and Papa John's is further evidenced by, among other things, the following factors:

(a)     During an August 2, 2018 interview with *TheStreet*, Defendant Schnatter admitted that he knew of problems within the Company yet did nothing to address them: "Should I have seen it?  Yes.  ***Did I sense something was going on?  Yes***, but I had no idea it was to the degree of just bad behavior, rude, crude and unacceptable that it was."

(b)     Indeed, subsequent letters and statements from Defendant Schnatter's attorney acknowledge that Defendant Schnatter was aware of the abusive culture festering within the Company.  In an August 22, 2018 letter from Defendant Schnatter's attorney, Garland A. Kelley of Glaser Weil, to Douglass B. Maynard of Akin Gump Strauss Hauer & Feld LLP, and Mr. John B. Beckman of Hogan Lovells US LLP, counsel to Papa John's, Mr. Kelley wrote: "As an initial matter, Mr. Schnatter's letter to the Company's Human Resources department, dated August 17,

***documents numerous allegations of inappropriate conduct, including those sexual in nature, that Mr. Ritchie emphatically does permit, condone and tolerate among his senior leadership team.***"

(c)     During the September 7, 2018 deposition of Defendant Schnatter that was taken in the Delaware Litigation, Defendant Schnatter tacitly acknowledged that he was aware of incidents of harassment within the Company.  During his deposition, which was cited in Papa John's pre-trial brief in the Delaware Litigation, dated October 2, 2018, Defendant Schnatter was asked "why a Company employee sent harassment allegations to Schnatter's assistant" and Schnatter responded because his attorney wanted to see these allegations.

(d)     According to the 7/19/18 Article, Defendant Ritchie was also aware of the misconduct and when this alleged misconduct occurred in his presence, he laughed instead of correcting or discouraging such behavior.

(e)     Similarly, according to the article "Tensions High at Papa John's, Even with Founder Gone" five current and former employees reported that Ritchie was aware of the inappropriate behavior that was occurring and did nothing to correct it.

156.    Defendant Schnatter's resignations and/or terminations on two separate occasions support a finding of scienter.  The timing of Defendant Schnatter's resignation and/or termination from his position as Papa John's CEO on December 18, 2017, supports scienter because it came shortly after the NFL Comment.  The timing of Defendant Schnatter's resignation and/or termination from his position as Chairman of the Board on July 11, 2018, further supports a finding of scienter because he resigned the very same day that the 7/11/18 Article was published.

157.    Additionally, the timing of O'Hern's retirement supports scienter because it came shortly after the media began reporting on the "bro culture" that was festering within the Company, naming O'Hern as one of the culprits.

158.    Relatedly, the fact that the Company created two new positions: (i) Chief of Diversity and Inclusion; and (ii) Chief People Officer after the 7/11/18 Article and the 7/19/18 Article were published further evidences Defendants' knowing or reckless disregard of the Company's diversity, inclusion and other cultural issues.

159.    Taken collectively, the facts and circumstances described herein demonstrate a strong inference that Defendants acted with scienter in making the misrepresentations and omissions challenged in this Amended Complaint.

160.    At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Papa John's, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Class Period.

161.    Defendants were also motivated to engage in this fraudulent course of conduct in order to enable certain Company insiders, including the Individual Defendants, to collectively sell 1,468,414 shares of their personally-held Papa John's stock, earning gross proceeds of more than $102 million, as follows:

| Insider | Date | Price | Shares Sold | Proceeds | % Sold |
|---|---|---|---|---|---|
| Cole Jr., Norborne P. (Director) | 2/28/2014 | $50.85 | 16,992 | $864,043 | 39.4% |
| | 3/6/2015 | $60.18 | 15,858 | $954,334 | |
| | 3/3/2016 | $58.36 | 9,800 | $571,928 | |
| | 3/3/2016 | $58.33 | 200 | $11,666 | |
| | | | 42,850 | $2,401,972 | |
| | | | | | |
| Guarascio, Phillip (Director) | 2/27/2015 | $62.16 | 14,944 | $928,919 | 32.7% |
| | 3/2/2015 | $61.93 | 7,472 | $462,741 | |
| | | | 22,416 | $1,391,660 | |
| | | | | | |
| Kraut, Robert C. (Officer) | 6/5/2015 | $68.00 | 2,493 | $169,524 | 26.6% |
| | | | 2,493 | $169,524 | |

| Insider | Date | Price | Shares Sold | Proceeds | % Sold |
|---|---|---|---|---|---|
| O Hern, Timothy C. (Officer) | 11/11/2014 | $50.00 | 5,818 | $290,900 | 54.3% |
| | 2/27/2015 | $63.02 | 9,550 | $601,841 | |
| | 5/19/2015 | $67.96 | 462 | $31,398 | |
| | 5/19/2015 | $68.10 | 5,900 | $401,790 | |
| | 11/9/2016 | $82.18 | 4,000 | $328,720 | |
| | 11/18/2016 | $83.88 | 275 | $23,067 | |
| | 2/23/2017 | $79.01 | 7,112 | $561,919 | |
| | 2/27/2017 | $78.61 | 968 | $76,094 | |
| | 6/2/2017 | $81.79 | 6,000 | $490,740 | |
| | 8/31/2017 | $75.00 | 2,562 | $192,150 | |
| | 8/31/2017 | $75.11 | 6,656 | $499,932 | |
| | 3/8/2018 | $61.81 | 10,963 | $677,623 | |
| | | | 60,266 | $4,176,174 | |
| | | | | | |
| Oyler, Caroline Miller (General Counsel) | 3/9/2018 | $61.00 | 1,766 | $107,726 | 9.5% |
| | | | 1,766 | $107,726 | |
| | | | | | |
| Ritchie, Stephen M. (President) | 8/12/2016 | $74.73 | 12,836 | $959,234 | 48.9% |
| | 11/4/2016 | $77.59 | 8,891 | $689,853 | |
| | 11/4/2016 | $78.36 | 3,899 | $305,526 | |
| | 5/31/2017 | $80.00 | 10,396 | $831,680 | |
| (Chief Operating Officer) | 11/7/2014 | $50.35 | 16,236 | $817,483 | |
| | 5/7/2015 | $64.10 | 7,393 | $473,891 | |
| | 5/7/2015 | $64.55 | 8,471 | $546,803 | |
| | 6/1/2015 | $69.00 | 2,750 | $189,750 | |
| | | | 70,872 | $4,814,220 | |
| | | | | | |
| Schnatter, John H. (Chief Executive Officer) | 2/26/2015 | $64.04 | 2,416 | $154,721 | 10.2% |
| | 4/23/2015 | $64.39 | 43,823 | $2,821,763 | |
| | 4/24/2015 | $64.53 | 46,838 | $3,022,456 | |
| | 4/24/2015 | $65.17 | 15,865 | $1,033,922 | |
| | 4/27/2015 | $65.48 | 77,139 | $5,051,062 | |
| | 4/27/2015 | $66.01 | 200 | $13,202 | |
| | 4/27/2015 | $64.50 | 39,513 | $2,548,589 | |
| | 4/28/2015 | $64.13 | 34,129 | $2,188,693 | |
| | 5/6/2015 | $66.21 | 628 | $41,580 | |
| | 5/6/2015 | $65.30 | 17,470 | $1,140,791 | |
| | 5/6/2015 | $64.38 | 170,861 | $11,000,031 | |
| | 5/7/2015 | $64.46 | 53,534 | $3,450,802 | |
| | 8/5/2016 | $76.27 | 17,879 | $1,363,631 | |
| | 8/8/2016 | $76.00 | 6,343 | $482,068 | |
| | 8/8/2016 | $76.01 | 100 | $7,601 | |
| | 8/22/2016 | $76.00 | 6,373 | $484,348 | |
| | 8/23/2016 | $76.12 | 5,110 | $388,973 | |
| | 8/24/2016 | $76.00 | 22,261 | $1,691,836 | |
| | 8/25/2016 | $76.01 | 44,714 | $3,398,711 | |
| | 8/29/2016 | $76.01 | 35,603 | $2,706,184 | |

| Insider | Date | Price | Shares Sold | Proceeds | % Sold |
|---------|------|-------|-------------|----------|--------|
| | 9/2/2016 | $76.00 | 4,736 | $359,936 | |
| | 10/3/2016 | $78.17 | 73,637 | $5,756,204 | |
| | 10/4/2016 | $77.02 | 76,551 | $5,895,958 | |
| | 10/5/2016 | $76.16 | 9,812 | $747,282 | |
| | 10/10/2016 | $78.10 | 22,306 | $1,742,099 | |
| | 10/11/2016 | $78.05 | 6,200 | $483,910 | |
| | 10/12/2016 | $78.08 | 23,852 | $1,862,364 | |
| | 10/13/2016 | $78.03 | 400 | $31,212 | |
| | 10/14/2016 | $78.10 | 25,690 | $2,006,389 | |
| | 10/17/2016 | $78.16 | 17,091 | $1,335,833 | |
| | 10/18/2016 | $78.30 | 41,065 | $3,215,390 | |
| | 10/18/2016 | $79.44 | 23,396 | $1,858,578 | |
| | 10/19/2016 | $80.50 | 63,318 | $5,097,099 | |
| | 10/19/2016 | $81.02 | 900 | $72,918 | |
| | 10/20/2016 | $80.07 | 22,096 | $1,769,227 | |
| | 10/21/2016 | $80.31 | 59,392 | $4,769,772 | |
| | 10/24/2016 | $80.60 | 14,294 | $1,152,096 | |
| | | | 1,125,535 | $81,147,229 | |
| Shapiro, Mark S. (Director) | 3/2/2018 | $60.78 | 8,232 | $500,341 | 16.3% |
| | | | 8,232 | $500,341 | |
| Thompson, Anthony N. (President) | 3/5/2014 | $52.49 | 15,148 | $795,119 | 10.2% |
| | | | 15,148 | $795,119 | |
| Tucker, Lance F. (Chief Financial Officer) | 2/27/2014 | $50.14 | 19,090 | $957,173 | 85.9% |
| | 2/27/2014 | $51.09 | 1,400 | $71,526 | |
| | 11/6/2014 | $50.02 | 6,332 | $316,727 | |
| | 12/1/2014 | $53.74 | 6,568 | $352,964 | |
| | 2/26/2015 | $63.56 | 16,000 | $1,016,960 | |
| | 3/2/2015 | $63.08 | 15,952 | $1,006,252 | |
| | 8/4/2016 | $77.27 | 6,334 | $489,428 | |
| | 11/4/2016 | $78.15 | 6,326 | $494,377 | |
| | 5/12/2017 | $82.39 | 4,051 | $333,762 | |
| | 3/1/2018 | $59.13 | 10,718 | $633,755 | |
| | 3/1/2018 | $59.14 | 13,883 | $821,041 | |
| | 3/2/2018 | $60.00 | 12,182 | $730,920 | |
| | | | 118,836 | $7,224,885 | |
| **Grand Total** | | | 1,468,414 | $102,728,849 | |

162.     The shares sold by Papa John's officers and directors during the Class Period were highly unusual in both amount (based on the sheer dollar value of shares sold) and timing (made

during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).

163.    These insider sales were also unusual in timing and amount because during the 1,625-day period prior to the Class Period, Papa John's insiders sold just 480,627 shares for proceeds of approximately $17.9 million.

164.    Accordingly, Defendants were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could personally profit from the artificial inflation in the trading price of Papa John's common stock resulting from their false and misleading statements and omissions during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

165.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Papa John's common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Papa John's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Papa John's or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

167.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

168.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Papa John's;

- whether the Individual Defendants caused Papa John's to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the price of Papa John's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

170.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

171.    During the Class Period, the market for Papa John's common stock was an efficient market for the follow reasons, among others:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Papa John's common stock traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company's stock traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased or acquired Papa John's common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

172.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

173.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**LOSS CAUSATION**

174.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Papa John's common stock and operated as a fraud or deceit on Class Period purchasers of Papa John's common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Papa John's common stock declined significantly as the prior artificial inflation came out of the stock's price.

175.    As a result of their purchases of Papa John's common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Papa John's common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $89.55 per share on December 20, 2016.

176.    By concealing from investors the adverse, material facts detailed herein, Defendants presented a misleading picture of Papa John's business, risks and future financial prospects.  When the truth about the Company was revealed to the market, the price of Papa John's common stock fell significantly, removing the inflation therefrom and causing real economic loss to investors who had purchased Papa John's common stock during the Class Period.

177.    On July 11, 2018, the 7/11/18 Article was published, highlighting the offensive racist remarks that Defendant Schnatter made during a diversity training session in May 2018.

178.    The market reacted sharply to this report, with shares of Papa John's stock declining to $48.33 per share, a decline of 5.1% from Papa John's closing stock price of $50.79 per share on Tuesday, July 10, 2018.  Papa John's stock, however, remained artificially inflated.

179.    On Sunday, July 15, 2018, Papa John's announced that it had created a special committee of the Board to "evaluate and take action with respect to all of the Company's relationships and arrangements with John H. Schnatter."  The press release also stated that the special committee specifically prohibited Defendant Schnatter from speaking on behalf of the Company.

180.    The market reacted negatively to this news, with shares of Papa John's declining from a close of $53.55 per share, on Friday, July 13, 2018, to close at $51.41 per share when the market opened back up on Monday, July 16, 2018 – a decline of 4%.

181.    The following week, the 7/19/18 Article was published, further shedding light on the sexual harassment and other inappropriate behavior of senior Papa John's executives.

182.    The market reacted negatively to this news, with shares of Papa John's stock declining from a close of $53.10 per share on July 18, 2018, to close at $50.52 on July 19, 2018 – a decline of 4.9%.  Papa John's stock, however, remained artificially inflated.

183.    Then, on Sunday, July 22, 2018, the Board voted to adopt a "poison pill" to prevent Defendant Schnatter from gaining a controlling interest in the Company.  The Company formally announced the decision in a press release on Monday, July 23, 2018.

184.    The market sharply reacted to this news, with shares of Papa John's stock declining from a close of $51.59 per share on Friday, July 20, 2018, to close at $46.56 per share when the market opened back up on Monday, July 23, 2018 – a decline of 9.7%.  Papa John's stock, however, remained artificially inflated.

185.    Finally, on August 7, 2018, after the market had closed, Papa John's stunned investors when the Company announced its financial results for the 2018 second quarter, the period ending July 1, 2018.  The Company revealed that adjusted earnings per diluted share decreased

*24.6%,* slumping to $0.49 in the second fiscal quarter of 2018 from $0.65 in the second fiscal quarter of 2017.   The press release also revealed that system-wide North America comparable sales decreased *6.1%* or 400 basis points.   Additionally, Papa John's was forced to revise its 2018 outlook and lower its adjusted earnings per share to *38.6%,* to $1.30 from $1.80 due to the negative sales trends.

186.   The market reacted negatively to this news, with Papa John's common stock declining from a close of $41.07 per share on August 7, 2018, to close at $38.94 per share on August 8, 2018 – a decline of 5.2%.   This drop removed the remaining inflation in the price of Papa John's stock, causing economic loss to investors who purchased Papa John's stock during the Class Period.

187.   When the truth about the Company was revealed to the market, the price of Papa John's common stock substantially declined.   Such decline removed the inflation from the price of Papa John's common stock, causing real economic loss to investors who had purchased Papa John's common stock during the Class Period.

188.   The declines in the price of Papa John's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in Papa John's common stock negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

189.   The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Papa John's common stock and the subsequent significant declines in the value of Papa John's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

190.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew or had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Papa John's who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

191.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

192.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

193.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Papa John's stock during the Class Period.

194.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Papa John's stock.  Plaintiff and the Class would not have purchased Papa John's stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

195.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Papa John's stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

196.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Papa John's, and their ownership of Papa John's stock, the Individual Defendants had the power and authority to cause Papa John's to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Lead Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 13, 2019                ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          LINDSAY LA MARCA


                                                /s/ *David A. Rosenfeld*
                                          DAVID A. ROSENFELD

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com
                                          drosenfeld@rgrdlaw.com
                                          llamarca@rgrdlaw.com

                                          *Lead Counsel for Plaintiff*

- 61 -