UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM, individually and on
behalf of all others similarly situated,

                    Plaintiffs,

      v.

PAPA JOHN'S INTERNATIONAL, INC.,
JOHN H. SCHNATTER, and STEVE M.
RITCHIE,

                    Defendants.
_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/16/20

18-CV-7927 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

      Lead Plaintiff Oklahoma Law Enforcement Retirement System ("Plaintiff") brings this putative securities class action against Papa John's International, Inc ("Papa John's" or the "Company") and two of its former executives, John Schnatter and Steve Ritchie (collectively, "Defendants"). Plaintiff alleges that Defendants falsely and misleadingly touted the Company's culture while enabling and perpetrating workplace sexual harassment. In so doing, according to the Amended Complaint ("AC"), Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the corresponding rule of the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 ("Rule 10b–5").

      Defendants move to dismiss this action for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motions are GRANTED.

# I.   BACKGROUND[1]

## A.  The Parties

Papa John's operates and franchises pizza delivery and carryout restaurants throughout the United States and abroad.  (AC ¶ 2.)  Schnatter founded the Company in 1984.  (AC ¶ 31.) Today, it is the third largest pizza delivery and carryout restaurant chain in the country.  (AC ¶ 2.)

Schnatter's name and likeness were central to the Papa John's brand.  Schnatter frequently appeared in the Company's advertisements and his image was featured on the Company's pizza boxes.  (*Id*.)  From February 25, 2014 through August 7, 2018 (the "Class Period"), he held a range of formal roles.  Until December 31, 2017, he was the Company's Chief Executive Officer.  (*Id*.)  Until July 11, 2018, he was also the Chairman of the Board.  (*Id*.) Briefly, from May 15, 2014 through July 30, 2015, he served as the Company's President.  (*Id*.) Schnatter remains the Company's largest shareholder, owning approximately 26% of its stock. (*Id*.)

Ritchie began working for Papa John's as a customer service representative in 1996 and steadily climbed the corporate ladder.  (AC ¶ 40.)  He was the Company's Senior Vice President from May 2013 through May 1, 2014.  (AC ¶ 24.)  Then, from May 15, 2014 through December 31, 2017, he was the Chief Operating Officer.  (*Id*.)  He took over Schnatter's role as President on July 30, 2015 and Schnatter's role as CEO on January 1, 2018.  (*Id*.)  He remained in those positions through the end of the Class Period.  (*Id*.)

---

[1] The facts recounted here are drawn primarily from the Amended Complaint. The Court assumes all well-pled facts to be true and draws all reasonable inferences in Plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers documents incorporated into the Amended Complaint by reference and documents publicly filed with the SEC.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Lead Plaintiff Oklahoma Law Enforcement Retirement Systems purchased Papa John's stock during the Class Period. (AC ¶ 21.) Specifically, between August 16, 2016 and June 26, 2018, Plaintiff bought 8,454 shares of the Company's common stock. (*Id.*)

### B. Public Statements and Disclosures During the Class Period

Plaintiff claims that Defendants made material and misleading representations, which can be sorted as follows:

> 1. *Statements Contained in the Papa John's Code of Ethics and Business Conduct (the "Code")*

The Code assured employees that they had the "the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards." (AC ¶ 70.) It pledged compliance with labor and employment laws and referenced guiding principles of honesty, fairness, respect, and trustworthiness. (AC ¶¶ 71, 73.)

> 2. *Statements Contained in Financial Disclosures, Press Releases, and Earnings Conference Calls*

On February 25, 2014, the first day of the class period, Papa John's filed an annual report on Form 10-K with the SEC (the "2013 10-K"). In that filing, the Company reported that it "consider[s] [its] team member relations to be good." (AC ¶ 75.) The 2013 Form 10-K further stated that the Company was "committed to the development and motivation of our team members through training programs, incentive and recognition programs and opportunities for advancement." (AC ¶ 77.) The 2013 Form 10-K also contained risk disclosures related to the Company's public image. For example, it warned that the "business and brand may be harmed if Mr. Schnatter's services were not available to the Company for any reason or the reputation of

Mr. Schnatter were negatively impacted." (AC ¶ 81.) The Company made these same representations in its 2014, 2015, 2016, and 2017 10-Ks. (AC ¶ 83.)

Defendants periodically conducted earnings conference calls with analysts and investors and issued press releases in connection with these financial disclosures. For instance, on a call to discuss financial results for the first quarter of 2015, Schnatter stated, "I would be remiss if I didn't mention our culture. We just got rated as one of the best places to work in Kentucky, that's a couple years in a row, and I think that permeates throughout the rest of the organization." (AC ¶ 94.) In a press release issued August 2, 2016, Schnatter again emphasized employee morale, stating that "it all comes down to better ingredients – and our most important ingredient is our people. We take care of our people . . . ." (AC ¶ 98.) On a February 22, 2017 conference call, Schnatter told investors that "[t]he fundamentals of the Company have never been better. Our food, our pizza scores, our service, our culture is at an all-time high." (AC ¶ 103.)

**C. Defendants' Actions That Allegedly Rendered its Representations Misleading**

*1. Schnatter's NFL Comment*

On November 1, 2017, on an earnings conference call with investors and analysts, Schnatter made a remark that was widely perceived as racist. (AC ¶ 58-59.) Papa John's had partnered with the National Football League (NFL) as its official pizza sponsor. On the call, Schnatter criticized NFL commissioner Roger Goodell for failing to "nip[] in the bud" activism among NFL players who knelt during the national anthem to protest police brutality and racism. (AC ¶ 58.) According to Schnatter, Goodell's handling of the "debacle" demonstrated "poor leadership." (*Id.*). Reports of these comments prompted customers to call for a boycott of the Company. (AC ¶ 59.)

The following month, on December 18, 2017, Papa John's announced in a press release that Schnatter was resigning from his position as the Company's CEO and that Ritchie was replacing him. (AC ¶ 105.) The press release emphasized that "the company's primary focus will be on its team members." (*Id.*) It quoted Ritchie, who stated, "By focusing on our team members, we will deliver the world class experiences our customers deserve." (*Id.*)

A year later, on February 27, 2018, Ritchie addressed the Company's ongoing sales slump. (AC ¶ 113.) He stated in a press release, "[a]ctions are underway to improve our brand proposition, how we connect with customers, and how we operate at the unit level." (*Id.*) On an earnings conference call that same day, Ritchie stressed that "the strength of our culture will determine to the success of our strategy. To be clear, it is not business as usual, at Papa John's." (*Id.*)

### 2. *Schnatter's Use of a Racial Slur*

At some unknown or unspecified point in May 2018, Schnatter used the "N-word" during a sensitivity training conference call. (AC ¶ 119.) According to a *Forbes* article published on July 11, 2018, the call included Papa John's executives and the marketing agency Laundry Service. (*Id.*) It involved a role-playing exercise for Schnatter, aimed at preventing public relations problems like those that surrounded the NFL comment. (*Id.*) Asked how he would distance himself from racist groups online, Schnatter responded that "Colonel Sanders called blacks [the N-word]" and never faced public backlash. (*Id.*) Schnatter also brought up his childhood in Indiana, where, he said, people used to drag Black people from trucks until they died. (*Id.*) Schnatter apparently intended his comments to convey his antipathy to racism, but to many on the call they had the opposite effect. (*Id.*) Schnatter confirmed the report. "News reports attributing the use of inappropriate and hurtful language to me during a media training

session regarding race are true," he stated.  (*Id.*)  On the day that *Forbes* published the story, the price of Papa John's stock fell 5.1 percent and Schnatter resigned as Chairman of the Board. (AC ¶¶ 121-22.)

A few days after the story's publication, on July 15, 2018, Papa John's named a special committee of the Board of Directors to assess "all of the Company's relationships and arrangements" with Schnatter.  (AC ¶¶ 123.)  The Company also announced that it had terminated "Schnatter's Founder Agreement, which defined his role in the Company, among other things, as advertising and brand spokesperson for the Company."  (*Id.*)

### 3.  Sexual Harassment and Misconduct at Papa John's

On July 19, 2018, eight days after it reported Schnatter's use of the "N-word," *Forbes* published a second article.  (AC ¶ 126.)  This article, based on interviews with 37 then-current and former Papa John's employees, described disturbing instances of workplace sexual harassment and misconduct, perpetrated by and with the tacit permission of senior executives, including Schnatter and Ritchie.  (*Id.*)

 Schnatter's behavior, the article alleged, "range[d] from spying on his workers to sexually inappropriate conduct, which has resulted in at least two confidential settlements."  (*Id.*) One former executive explained to *Forbes* that "the married Schnatter would disappear for days on work trips, stirring suspicion that he was 'hooking up with girls.'"  (*Id.*)  A female employee alleged that "Schnatter asked about her bra size and whether she'd slept with her previous boss, and that he never let her pass in a hall without giving her a hug."  (*Id.*)  A male executive recalled Schnatter telling him that he "had a cute wife, if she'd lose some weight."  (*Id.*)

The harassment reportedly escalated following Ritchie's appointment as COO and President.  "The longer he was in that position, the more rapidly the culture declined," a departed

employee told *Forbes*. (*Id.*) Executives apparently reserved their crudest jokes for off-site Company gatherings, where they referenced "gangbangs" and asked whether women wanted to "jump on the train." (*Id.*) Meetings, too, were allegedly filled with profanity and inappropriate comments. Rather than intervene, Ritchie "would just laugh." (*Id.*)

The conduct of Dustin Couts, a longtime senior leader, exemplified the so-called "bro" culture at Papa John's. (AC ¶ 44.) On one occasion, he discussed pornography with a junior female employee; on another occasion, he showed inappropriate images to colleagues on his cell phone; and on a third occasion, he asked a coworker if she was menstruating after she disagreed with him. (AC ¶ 46.) Ritchie was aware of these incidents. (AC ¶ 126.) He called the unit Couts oversaw a "frat." (AC ¶ 47.)

### D. Decline in Share Value

After *Forbes* broke the news of the toxic culture inside Papa John's, the Company's stock price fell 4.9 percent, from a closing price of $53.10 per share on July 18, 2018, to $50.52 per share on July 19, 2018. (AC ¶ 128.) It fell further when Papa John's announced that its Board had voted to adopt a "poison pill" to prevent Schnatter from gaining a controlling interest in the Company; the stock declined 9.7 percent, from a close of $51.59 per share on Friday, July 20, 2018, to close at $46.56 per share on Monday, July 23, 2018. (AC ¶¶ 183-84). A third drop occurred when Papa John's released its financial results for the second quarter of 2018; the stock fell from a close of $41.07 per share on August 7, 2018 to close at $38.94 per share on August 8, 2018. (AC ¶186.)

### E. Procedural History

Plaintiff initiated this action on August 30, 2018 and filed the Amended Complaint on February 19, 2019. (ECF No. 54.) On March 29, 2019, Defendant Schnatter moved to Dismiss

the Amended Complaint.  ("Schnatter Mot.," ECF No. 58.)  On the same day, Defendants

Ritchie and Papa John's, jointly, also moved to dismiss the Amended Complaint.  ("Ritchie

Mot.," ECF No. 60.)

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(6), Rule 9(b), and the PSLRA Pleading Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  By contrast, a complaint is

properly dismissed where, as a matter of law, "the allegations in a complaint, however true,

could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.   The Court must

accept as true all well-pled factual allegations in a complaint and "draw[ ] all inferences in the

plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006).  That dictate

does not apply, however, to "legal conclusion[s] couched as a factual allegation[s]." *Twombly*,

550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Beyond meeting the demands of Rule 12(b)(6), a plaintiff asserting securities fraud

claims must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)

and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), in order to

survive a motion to dismiss.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d

Cir. 2007); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The

complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99.   "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

Similarly, under the PSLRA, where a claim depends on allegations that the defendant made an untrue statement of material fact or made a statement that was misleading by virtue of its omission of a material fact,  "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Id.* § 78u-4(b)(2).

### B.  Sections 10(b) and 20(a); Rule 10b-5

Plaintiff asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b–5.  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Under the SEC's implementing rule, Rule 10b–5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R, § 240.10b–5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

Section 20(a) imposes liability on "control persons"—those who, "directly or indirectly, control[] any person liable under" the Exchange Act. 15 U.S.C. § 78t(a). To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. If a plaintiff has not adequately alleged a primary violation—that is, a claim under another provision of the Exchange Act—the derivative Section 20(a) claim must fall. *Id.*

Defendant Schnatter contends that Plaintiff failed to plead adequately three of the elements of securities fraud under Section 10(b)(5) and Rule 10b-5: a material misrepresentation or omission, scienter, and loss causation. (Schnatter Mot. at 11.) Defendants Ritchie and Papa John's focus on the former two elements. (Ritchie Mot. at 12.) All Defendants argue that Amended Complaint fails to state a Section 20(a) claim.

## III. DISCUSSION

The varied allegations in the Amended Complaint rest on a single theory of securities fraud. Plaintiff alleges that Schnatter, Ritchie, and other executives sexually harassed Papa John's employees and cultivated a crude and hostile workplace culture. Plaintiff alleges that, with the rise of the #MeToo movement, it was likely that this wrongdoing would come to light and harm the Company's reputation, adversely impacting operations and revenue. (AC ¶ 127.) Meanwhile, Defendants misleadingly touted the Company's culture and failed to divulge the danger that business would suffer should customers learn the truth. (*Id.*). Plaintiff has not plausibly alleged that Defendants' positive assurances about the Company's culture exceeded the protected bounds of generic puffery. Nor has Plaintiff plausibly alleged that the risk that Papa

John's would face a #MeToo reckoning was so concrete and substantial that there arose a duty to disclose it.

### A. Material Misrepresentations or Omissions Under Section 10(b) and Rule 10b-5

To survive a motion to dismiss, a securities fraud complaint must allege that the defendant made "a material misrepresentation or a material omission as to which he had a duty to speak." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Circ. 1999). A fact is material if it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quotation marks omitted). Put differently, where "there is a substantial likelihood that a reasonable person would consider [a fact] important in deciding whether to buy or sell shares," that fact is material. *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994). Statements that are too vague or general to be relied upon are known as puffery and, by definition, are not material. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

In addition to being material, a statement or omission must be false or misleading in order to be actionable. Whether a statement is false or misleading is "evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)).

To base a claim on an omission—such as a failure to disclose a material business risk—a plaintiff must also plead that the defendant had a duty to disclose the omitted information. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material

information." *Matrixx Initiatives*, 563 U.S. at 44; *see also Basic Inc.*, 485 U.S. at 239 n.17

("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). An omission is

actionable under Rule 10b-5 only when disclosure of the omitted information was necessary to

prevent a particular statement from misleading investors. *See Matrixx Initiatives*, 563 U.S. at 44

(citing 17 C.F.R. § 240.10b–5(b)).

The material misrepresentations or omissions alleged in the Amended Complaint under

Section 10(b) and Rule 10b-5 fall into three broad categories: (1) statements contained in the

Papa John's Code of Ethics and Business Conduct; (2) positive assertions made in SEC filings,

press releases, and earnings conference calls; and (3) risks disclosed in SEC filings. None of the

statements or omissions in these categories are actionable.

### 1. Statements in the Papa John's Code of Ethics and Business Conduct

The statements in the Code are quintessential puffery. "General statements about

reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that

they are too general to cause a reasonable investor to rely upon them." *City of Pontiac

Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal

quotation marks omitted). In other words, they are not statements of material facts, and are thus

incapable of forming the basis for a Section 10(b) claim.

Courts have allowed claims based on alleged misrepresentations contained in a code of

ethics or conduct to survive a motion to dismiss only in rare circumstances. *Constr. Laborers

Pension Tr. v. CBS Corp.*, No. 18-CV-7796, 2020 U.S. Dist. LEXIS 7787, at *21 (S.D.N.Y. Jan.

15, 2020) (Caproni, J.). In *In re Signet Jewels Ltd. Securities Litigation*, for example, the court

found that certain statements in Signet's code were actionable because they were "directly at

odds with the conduct alleged in the complaint." 2018 U.S. Dist. LEXIS 199809, at *52–53

(S.D.N.Y. Nov. 26, 2018) (McMahon, C.J.). Signet's code stated that the company made employment decisions based solely on merit and that employees could report workplace misconduct through an anonymous process without retaliation. *Id.* at \*53-54. In reality, "the company conditioned employment decisions on whether female employees acceded to sexual demands and retaliated against women who attempted to anonymously report sexual harassment." *Id.* The court determined that the code's specific statements about reporting and retaliation were materially false and misleading. Other, "generalized statements touting the importance of Signet's relationship with its employees and consumer trust in the Signet brand," however, were the "sort of broad, aspirational, and vague puffery statements that no reasonable investor could possibly consider significant in making investment decisions." *Id.* at 54; *see also Singh*, 918 F.3d at 63 (statements in a code of ethics that amounted to "general declarations about the importance of acting lawfully and with integrity" fell "squarely within" the category of inactionable puffery.)

In *CBS Corp.*—a putative securities class action premised on sexual harassment by CBS's former Chairman and CEO Les Moonves—the court determined that representations in CBS's Business Conduct Statement were similarly "too general and disconnected from Plaintiffs' central theory of securities fraud to be material." *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at \*21. The CBS Business Conduct Statement asserted that the broadcasting company "has a 'zero tolerance' policy for sexual harassment"; that CBS "will" take "all steps" and "remedial action" to stop "sexual harassment" and "protect the workplace environment"; and that CBS "will promptly and thoroughly investigate" sexual harassment allegations. *Id.* at \*22-23. The court concluded that "[n]o reasonable investor would rely on these statements as assurance that CBS had no high-level executive who was vulnerable to a '#MeToo moment.'" *Id.* at 23.

The statements in the Papa John's Code are broad, aspirational, and vague; in this way, they resemble the statements in the Signet and CBS codes that were held inactionable. The Code required employees to exhibit "the highest ethical standards" in dealing with customers and colleagues, guided by "principles of honesty, fairness, mutual respect, trustworthiness, courage and personal and professional commitment." (AC ¶ 71.) The Code also committed Papa John's and its employees to complying with "all applicable labor and employment laws and regulations," to ensure a working environment "free of harassment or other intimidating, hostile or offensive behavior based" on race and gender, among other characteristics and identities. (*Id.*) Notably, the Code failed "entirely to elaborate on what exactly the Company would do to prevent or respond to workplace sexual harassment." *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at *24. And like in *CBS Corp.*, there is "no allegation that the Company highlighted its [Code] in the wake of revelations about workplace sexual harassment to reassure investors that [it] would not be rocked by similar allegations against its executives." *Id.* at *25. No reasonable investor could have relied on the Code's standard and vague assurances in making investment decisions.

The fact that Defendants regularly claimed that its culture and reputation were key to its success does not alter this conclusion. "The importance of [a company's] culture and reputation to its success does not mean that any statement lauding these intangibles was material under the securities laws." *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) (Engelmayer, J.). Rather, the relevant inquiry "must consider whether the statement made was sufficiently specific that a reasonable investor could rely on it as a 'guarantee of some concrete fact or outcome.'" *Id.* (quoting *UBS*, 752 F.3d at 185). The statements in the Code were not.

The positive assertions about the Company's culture in SEC filings, press releases, and earnings conference calls are likewise inactionable as immaterial puffery. These statements did not assert or imply that Schnatter, Ritchie, or other executives had never engaged in misconduct or would not be implicated in the #MeToo movement. They were, instead, expressions of "general corporate optimism." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 392 (2d Cir. 2015).

Other courts have dismissed as puffery assurances about workplace safety and intolerance for sexual harassment. For example, after firing Charlie Rose for sexual misconduct, CBS stated that it had "worked to strengthen existing systems to ensure a safe environment," that it "offer[s] employees discretion and fairness," and that it takes "swift action when [it] learn[s] of unacceptable behavior." *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at *35. Faced with claims based on Les Moonves's subsequent #MeToo scandal, the court regarded these statements as "little more than a pep talk." *Id.* at 36.

Another securities class action in this district centered on the decline of CTPartners stock after a *NY Post* article recounted allegations of lewd behavior and gender discrimination by CTPartners' top executives. *Lopez*, 173 F. Supp. 3d at 18. CTPartners responded to the *NY Post* article in a press release, stating that it "takes all allegations of discrimination very seriously . . . [and] is fundamentally committed to a diverse workforce, and promotes an inclusive and positive working environment." *Id.* at 19. The court held that this response was "too hazy and general for any reasonable investor to have relied upon [it]." *Id.* at 128.

The statements alleged here to be materially false and misleading are even hazier. None mention sexual harassment or misconduct. They include: "We consider our team member

relations to be good" (AC ¶ 75); "We are committed to the development and motivation of our team members through programs, incentive and recognition programs and opportunities for advancement" (AC ¶ 77); "The culture of Papa John's, really, is one that attracts really quality people" (AC ¶ 92); "[O]ur most important ingredient is our people. We take care of our people" (AC ¶ 98); "Our people-powered strategy has developed a passionate culture throughout the brand . . ." (AC ¶ 100); "We believe our continuous commitment to enhance culture and quality will further differentiate our premium brand from the rest of the industry" (AC ¶ 102); "Our food, our pizza scores, our service, our culture is at an all-time high" (AC ¶ 103); "An inspired culture will always be our most competitive differentiation" (AC ¶ 107); and "[T]he strength of our culture will determine the success of our strategy. To be clear, it is not business as usual, at Papa John's" (AC ¶ 115). The last statement, which followed Schnatter's NFL comment and might be understood to imply that the Company had since addressed internal problems, comes closest to stating a misleading material fact but is simply too vague to have invited an investor's reasonable reliance.

### 3. Risks Disclosed in SEC Filings

Plaintiff argues that risk disclosures contained in Defendants' SEC Filings were misleading "half-truths." Under Rule 10b-5, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Additionally, Item 503(c) of SEC Regulation S-K requires that certain filings "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (Koeltl, J.) (quoting 17 C.F.R. § 229.503(c)). Courts in this Circuit have generally found that the disclosure requirements of Item 503(c) and Rule 10b-5 are coextensive.

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (Koeltl, J.) (collecting cases).  Under these provisions, risk disclosures are actionable half-truths when a company discloses a risk that could have an impact on its business when, in fact, that risk has already materialized.  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (Sweet, J.).

For its principal example of a misleading half-truth, Plaintiff points to the Company's 2013 10-K disclosure about the harms that would result if Schnatter's role or reputation were compromised.  Papa John's disclosed that "our business and brand may be harmed if Mr. Schnatter's services were not available to the Company for any reason or the reputation of Mr. Schnatter were negatively impacted."  (AC ¶ 81.)  According to Plaintiff, this disclosure, while accurate, was deceptive because Schnatter was at the time fueling a toxic workplace culture, "which heightened the risk that his reputation and that of the Company would be harmed."  (Pls. Opp'n. to Ritchie Mot. at 16; Pls. Opp'n. to Schnatter Mot. at 7.)

As an initial matter, Plaintiff's argument that this risk of harm had materialized before the filing of the 2013 10-K is speculative and unsupported.  The Amended Complaint does not specify when Schnatter began harassing employees, nor when his harassing behavior became widely known, including to those individuals who had the power to fire him.   What is more, the allegations remained uncharged and unadjudicated throughout the class period.  *See City of Pontiac*, 752 F.3d at 184 ("[d]isclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (citations and quotation marks omitted).  Even if the risk that Schnatter would be disgraced or fired increased with the expanding influence of the #MeToo movement, "[a]n increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be

misleading." *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at *33.  Statements regarding Schnatter's importance to the Company were not misleading for having omitted unadjudicated allegations that might one day lead to his ouster.

### B.  Omissions Under Item 303 of Regulation S-K

Item 303 of Regulation S-K creates an affirmative disclosure requirement independent of the related obligations arising under Rule 10b-5.  In this Circuit, "Item 303's affirmative duty to disclose . . . can serve as the basis for a securities fraud claim under Section 10(b)."  *Stratte-McClure*, 776 F.3d at 101.  As relevant here, Item 303 instructs companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  These disclosures are "necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'"  *Stratte-McClure*, 776 F.3d at 101 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 SEC Docket 1330, 1989 SEC LEXIS 1011 (May 18, 1989)).

"Disclosures required by Item 303 will most often relate to issues in the realm of micro and macroeconomics; for example, a 'reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.'"  *CBS* Corp. 2020 U.S. Dist. LEXIS 7787, at *41 (quoting Release No. 6835, 1989 SEC LEXIS 1011).  Information about workplace sexual misconduct is not categorically exempt from Item 303's disclosure requirements.  *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at *43. Although "Item 303 is aimed [. . .] at more quotidian matters," such as trends and uncertainties

related to financial conditions and operations rather than offensive and scandalous behavior by corporate executives, *Lopez*, 173 F. Supp. 3d at 34, Item 303's requirements are "sensitive to historical context," *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at *43.  Thus, "[a]s developments like #MeToo reshape the landscape of risk to a company of retaining an executive who engaged in past sexual misconduct," reasonable investors may increasingly interpret the absence of an Item 303 disclosure to imply the nonexistence of #MeToo problems.  *Id.*

Here, however, the Amended Complaint has not adequately pled the existence of an uncertainty that was both "presently known to management" and "reasonably likely to have material effects on the registrant's financial conditions or results of operations," as required by Item 303.  As in *Lopez*, Plaintiff's contention that "the executives' boorish behavior would ultimately impact the bottom line . . . requires one to have foreseen, essentially, that this behavior would be scandalously revealed, as it was in the [*Forbes* article], and provoke such executive suite turbulence so as to impair the Company's financial condition or operational results. Except with the benefit of hindsight, that scenario was speculative and conjectural."  *Lopez,* 173 F. Supp. 3d at 34.   Plaintiff urges that, because Schnatter's racist comments had come to light, Defendants could have "reasonably expected" his sexual harassment to come to light as well. But the Amended Complaint contains no particularized allegations that this sequence of events would create "anything close to a known reasonable likelihood of a material impact on financial performance."  *CBS Corp.*, 2020 U.S. Dist. LEXIS 7787, at *45. The possibility that Schnatter and other executives would be exposed as harassers and then forced to leave the Company or assume diminished roles, and that these changes would reduce revenue by disrupting operations

and damaging the Company's brand, rests on a tenuous chain of causality and falls short of a known risk, disclosure of which Item 303 would mandate.[2]  *See id.*

## C. Scienter and Loss Causation

Because the Court holds that Plaintiff has not adequately pled a material misrepresentation or omission under Section 10(b) or Rule 10b-5, the Court has no occasion to address Defendants' alternative grounds for dismissal, based on alleged deficiencies in Plaintiff's pleadings as to scienter and loss causation.

## D. Control Person Liability Under Section 20(a)

Because Plaintiff has not stated a claim for a primary violation of the Exchange Act by any controlled person, Plaintiff's claims against Schnatter and Ritchie based on control person liability under Section 20(a) are also incapable of surviving Defendants' motions to dismiss.

## E. Leave to Replead

Plaintiff requested leave to amend its complaint should the Court grant Defendants' motions to dismiss.  (Pls. Opp'n. to Ritchie Mot. at 25 n. 23; Pls. Opp'n. to Schnatter Mot. at 19 n. 22.)   Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires."  "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013).  Nonetheless, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously

---

[2] It is worth noting that sexual harassment and misconduct can impact financial performance in the absence of public revelation.  Research demonstrates that sexual harassment results in higher rates of employee absenteeism and turnover, as well as lower productivity.  *See* Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 Colum. L. Rev. 1583, 1652 (2018).  But Plaintiff has not alleged—at least with any particularity—that the sexual harassment at Papa John's produced these effects, nor that these effects gave rise to a duty of disclosure under Item 303.

allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008).

Plaintiff has amended its complaint only once, pursuant to a stipulation. (ECF No. 49.) In the exercise of its discretion, the Court grants Plaintiff leave to replead within forty-five days from the date of this Opinion and Order.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the amended complaint are GRANTED. The Clerk of Court is respectfully directed to terminate the pending motions. (ECF Nos. 56, 59, 62.)

SO ORDERED.

DATED: New York, New York
March 16, 2020

_____/s/ Kimba M. Wood_____
KIMBA M. WOOD
United States District Judge