UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

PAPA JOHN'S INTERNATIONAL, INC.,
JOHN H. SCHNATTER, and STEVE M.
RITCHIE,

Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 3, 2021

18-CV-7927 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

Lead Plaintiff Oklahoma Law Enforcement Retirement System ("Plaintiff") brings this

putative class action against Papa John's International, Inc. ("Papa John's" or the "Company")

and two of its former executives, John Schnatter and Steve Ritchie (collectively, "Defendants").

Plaintiff alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the corresponding rule of the

United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 ("Rule 10b-

5").

The First Amended Complaint ("FAC", ECF No. 54) alleged that Defendants made false

and misleading statements about Papa John's culture and failed to disclose material information

about its toxic workplace culture.  The Court granted Defendants' motions to dismiss the FAC

because the allegedly false and misleading statements upon which Plaintiff relied were

inactionable "puffery," and because Plaintiff's allegations about Papa John's toxic workplace

culture were far too speculative to meet Rule 12(b)(6), Rule 9(b), and the PSLRA's pleading

standards.  *See Oklahoma Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550 (S.D.N.Y. 2020) ("*Papa John's I*").

Plaintiff filed a Second Amended Complaint ("SAC", ECF No. 81) that relies on, essentially, the same set of facts that Plaintiff pled in the FAC.  For the reasons set forth below, the Court GRANTS Defendants' motions to dismiss the SAC.

## BACKGROUND[1]

Given that most of the facts in the SAC are contained in the FAC and have been set forth in *Papa John's I*, the Court will summarize them only briefly.

## I.  The Parties

Defendant Papa John's is a Delaware corporation with its principal place of business in Kentucky.  (SAC ¶ 27.)  Papa John's operates and franchises pizza delivery and carryout restaurants throughout the United States and internationally.  (SAC ¶ 2.)

Schnatter founded Papa John's in 1984 and remains one of Papa John's largest shareholders.  (SAC ¶¶ 2, 28.)  Schnatter's name and likeness were central to the Papa John's brand; he frequently appeared in the Company's advertisements, and his image was featured on the Company's pizza boxes.  (SAC ¶ 36.)  From February 25, 2014 through August 7, 2018 (the "Class Period"), he held a range of executive positions.  He was Papa John's Chief Executive Officer from April 3, 2009 through December 31, 2017, Chairman of the Board from May 10, 2007 through July 11, 2018, and President from May 15, 2014 through July 30, 2015.  (SAC ¶¶ 1, 28.)

---

[1] The facts recounted here are drawn primarily from the SAC.  The Court assumes all well-pled facts to be true and draws all reasonable inferences in Plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers documents incorporated into the SAC by reference and documents publicly filed with the SEC.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Ritchie began working for Papa John's as a customer service representative in 1996 and steadily climbed the corporate ladder.  (SAC ¶ 45.)  He became the Senior Vice President from May 2013 through May 1, 2014.  (SAC ¶ 29.)  Then, from May 15, 2014 through December 31, 2017, he was the Chief Operating Officer.  (SAC ¶ 29.)  He took over Schnatter's role as President on July 30, 2015 and Schnatter's role as CEO on January 1, 2018.  (SAC ¶ 29.)  He remained in those positions through the end of the Class Period.  (SAC ¶ 29.)

Lead Plaintiff Oklahoma Law Enforcement Retirement Systems purchased Papa John's common stock during the Class Period.  (SAC ¶ 26.)

## II.   Key Events

During the Class Period, Defendants faced a range of negative publicity.

On a November 1, 2017 earnings call with investors and market analysts, Schnatter criticized the National Football League's ("NFL") handling of NFL players kneeling during the National Anthem to protest police brutality and racism.  (SAC ¶ 68.)  Schnatter commented that the controversy "should have been nipped in the bud 1.5 years ago."  (SAC ¶ 68.)  Schnatter's comments were prompted by the NFL's failure to resolve the controversy, which led to a decreased viewership and decreased sales for Papa John's, the official pizza sponsor of the NFL.  (SAC ¶ 69.)  Journalists and the media viewed Schnatter's comments as racist.  (SAC ¶ 69.)  As a result, Papa John's faced public backlash, including from customers who vowed to boycott the Company.  (SAC ¶ 69.)  Papa John's issued a press release announcing Schnatter's resignation as CEO and Ritchie's appointment on December 18, 2017.  (SAC ¶ 113.)  The press release stated that under Ritchie's leadership, "the company's primary focus will be on its team members." (SAC ¶ 113.)

On July 11, 2018, *Forbes* reported that during a May 2018 diversity sensitivity conference call arranged between Papa John's executives and marketing agency Laundry Service, Schnatter used the "N-word" and made inappropriate and hurtful remarks regarding race.  (SAC ¶ 140.)  When asked during a role-playing exercise how he would distance himself from racist groups online, Schnatter attempted to downplay the significance of his NFL comment by responding that "Colonel Sanders called blacks [the N-word]" and never faced public backlash.  (SAC ¶ 140.)  Schnatter also brought up his childhood in Indiana, where, he said, people used to drag African Americans from trucks until they died.  (SAC ¶ 140.)  Although Schnatter apparently intended his comments to convey his antipathy to racism, many individuals on the call found his remarks to be offensive.  (SAC ¶ 140.)  Schnatter resigned as Chairman of the Board the day that *Forbes* published the article.  (SAC ¶ 148.)  On July 15, 2018, Papa John's announced that it was cutting ties with Schnatter by, among other things, terminating his role as advertising and brand spokesperson, and creating a special committee of the Board to assess "all of the Company's relationships and arrangements" with Schnatter.  (SAC ¶ 144.)

On July 19, 2018, *Forbes* published a separate article in which 37 unnamed, former employees described disturbing instances of workplace sexual harassment and misconduct in which senior executives of the company engaged.  (SAC ¶ 147.)  These instances include Schnatter's sexual misconduct toward women and at least two resulting settlements; Schnatter asking a female employee "about her bra size and whether she'd slept with her previous boss," and "never let[ting] her pass in a hall without giving her a hug"; Schnatter telling a senior executive that he "had a cute wife, if she'd lose some weight"; female employees being "mocked and asked if they were menstruating"; Dustin Couts, a longtime operations leader, discussing pornography with a female employee, showing inappropriate images to other colleagues, and

asking a coworker if she was on her period after she disagreed with him; male executives making references to "gangbangs" and whether women wanted "to jump on the train"; and Ritchie being present during many of these occasions and laughing along.  (SAC ¶ 147.)  In sum, Schnatter, Ritchie, and other Papa John's senior employees enabled and participated in a toxic, "bro" culture.  (SAC ¶¶ 17, 147.)

After *Forbes* published the July 19 article, Papa John's stock price fell 4.9 percent, from a closing price of $53.10 per share on July 18, 2018, to close at $50.52 per share on July 19, 2018.  (SAC ¶¶ 149, 206.)  The stock price dropped further when Papa John's announced that its Board had voted to adopt a "poison pill" to prevent Schnatter from gaining a controlling interest in the Company on July 23: the stock price fell 9.7 percent, from a close of $51.59 per share on Friday, July 20, 2018, to close at $46.56 per share on Monday, July 23, 2018.  (SAC ¶¶ 207-08.)  Another drop occurred when Papa John's released its financial results for the second quarter of 2018 on August 7: the stock price fell from a close of $41.07 per share on August 7, 2018 to close at $38.94 per share on August 8, 2018.  (SAC ¶ 209-10.)

## III.    The First Amended Complaint and the Court's Opinion in *Papa John's I*

On February 19, 2019, Plaintiff filed the FAC alleging that, during the Class Period, Defendants made material misrepresentations and omissions in its Code of Ethics and Business Conduct (the "Code"), and also in positive assertions made in SEC filings, press releases, and earnings conference calls.  Accordingly, Plaintiff claimed that Defendants violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5.  (FAC ¶¶ 191-97.)

The Code, for example, assured employees that they had the "the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards"; that "[t]eam members in leadership roles bear the additional responsibility of

5

fostering a culture in which compliance with policies, procedures, laws and regulations is a critical business activity"; and that "[w]e must govern our conduct and ourselves by the principles of honesty, fairness, mutual respect, trustworthiness, courage and personal and professional commitment."  (FAC ¶¶ 69-73.)  In *Papa John's I*, the Court held that these statements were not material because they constitute "quintessential puffery."  444 F. Supp. 3d at 560-61.

In SEC filings, press releases, and earnings conference calls, Defendants often touted its culture:  "We are committed to the development and motivation of our team members through programs, incentive and recognition programs and opportunities for advancement" (FAC ¶ 77); "We believe our continuous commitment to enhance culture and quality will further differentiate our premium brand from the rest of the industry" (FAC ¶ 102); "An inspired culture will always be our most competitive differentiation" (FAC ¶ 107); "[T]he strength of our culture will determine the success of our strategy; To be clear, it is not business as usual, at Papa John's" (FAC ¶ 115); and "[o]ur business and brand may be harmed if Mr. Schnatter's services were not available to the Company for any reason or the reputation of Mr. Schnatter were negatively impacted" (FAC ¶ 81).  The Court held that these statements were inactionable because they were too "hazy and general," or otherwise relied on speculation.  *Papa John's I*, 444 F. Supp. 3d at 562-63.  The Court, however, granted Plaintiff leave to amend.  *Id.* at 564-65.

## IV.    The Second Amended Complaint

On April 30, 2020 Plaintiff filed the SAC.  (Pl.'s Opp'n to Ritchie Mot., ECF No. 96.)  In the SAC, Plaintiff's allegations continue to rely on largely the same set of allegedly material misrepresentations and omissions in Papa John's Code, press releases, earnings conference calls, and financial disclosures.  Likewise, Plaintiff also continues to rely on Schnatter's NFL

comment, the July 11 *Forbes* article about Schnatter's use of the "N-word," and the July 19

*Forbes* article about the toxic culture at Papa John's.

The SAC emphasizes that "Defendants knew about the toxic culture of harassment and

intimidation flourishing within the Company – because Schnatter and Ritchie were directly

responsible for cultivating it" (Pl.'s Opp'n to Ritchie Mot. at 2).  The SAC also emphasizes that

Defendants' knowledge, "following the explosion of the #MeToo movement," renders their

material misrepresentations and omissions actionable (*id.*).

On June 1, 2020 Papa John's and Ritchie moved to dismiss the SAC.  (ECF No. 87.)

Separately, Schnatter moved to dismiss the SAC on the same day.  (ECF No. 84.)  On July 15,

Plaintiff filed a separate opposition to each motion.  (ECF Nos. 95-96.)  On September 4, Papa

John's and Ritchie filed a reply (ECF No. 102), and Schnatter filed his reply separately (ECF No.

101).

## LEGAL STANDARDS[2]

### I.   Rule 12(b)(6), Rule 9(b), and the PSLRA Pleading Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  By contrast, a complaint is

properly dismissed where, as a matter of law, "the allegations in a complaint, however true,

could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  The court must

accept as true all well-pled factual allegations in a complaint and "draw[] all inferences in the

---

[2] The relevant substantive law on Sections 10(b) and 20(a) of the Exchange Act, Rule 10b-5, and Item 303 of
Regulation S-K in the Second Circuit has not changed in the time since the Court dismissed the FAC.

plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (quotation omitted).  That dictate, however, does not apply to "legal conclusion[s] couched as a factual allegation[s]." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

In addition to meeting the demands of Rule 12(b)(6), a plaintiff asserting securities fraud claims must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), in order to survive a motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-24 (2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI*, 493 F.3d at 99.  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  *Id.*

Similarly, under the PSLRA, where a claim depends on allegations that the defendant made an untrue statement of material fact or made a statement that was misleading by virtue of its omission of a material fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).

## II.    Sections 10(b) and 20(a); Rule 10b-5

Plaintiff asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule

10b-5.  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of

any security . . . any manipulative or deceptive device or contrivance in contravention of such

rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Under the SEC's

implementing rule, Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or

to omit to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead six

elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quotation omitted).

Section 20(a) imposes liability on "control persons"—those who, "directly or indirectly,

control[] any person liable under" the Exchange Act.  15 U.S.C. § 78t(a).  To state a claim under

Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control

of the primary violator by the defendant, and (3) that the defendant was, in some meaningful

sense, a culpable participant in the controlled person's fraud."  *ATSI*, 493 F.3d at 108.  If a

plaintiff has not adequately alleged a primary violation—that is, a claim under another provision

of the Exchange Act—the derivative Section 20(a) claim must fall.  *Id.*

Defendants contend that Plaintiff failed adequately to plead two of the elements of

securities fraud under Section 10(b)(5) and Rule 10b-5: (1) a material misrepresentation or

omission; and (2) scienter.  (Schnatter Mem. at 9, 17, ECF No. 86; Ritchie Mem. at 11, ECF No.

9

91.)  Defendants also argue that the SAC fails to state a Section 20(a) claim.  (Schnatter Mem. at 25; Ritchie Mem. at 25.)

## DISCUSSION

The SAC alleges the same type of securities fraud as the FAC.  Plaintiff alleges that Schnatter, Ritchie, and other executives sexually harassed Papa John's employees and cultivated a toxic workplace culture.  Plaintiff claims that, with the rise of the #MeToo movement, it was likely that their wrongdoing would come to light and harm the Company's reputation, adversely impacting operations and revenue.  (SAC ¶ 148.)  Plaintiff adds that Defendants misleadingly touted the Company's culture and failed to divulge the danger that business would suffer, should customers learn the truth.  (SAC ¶ 9.)

The SAC still fails plausibly to allege that Defendants' positive assurances about the Company's culture exceeded the protected bounds of generic puffery.  Nor has the SAC plausibly alleged that the risk that Papa John's would face a #MeToo reckoning was so concrete and substantial that there arose an affirmative duty to disclose it.

## I.     Material Misrepresentations or Omissions Under Section 10(b) and Rule 10b-5

To survive a motion to dismiss, a securities fraud complaint must allege that the defendant made "a material misrepresentation or a material omission as to which he had a duty to speak."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  A fact is material if it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quotation marks omitted).  Put differently, where "there is a substantial likelihood that a reasonable person would consider [a fact] important in deciding whether to buy or sell shares," that fact is material.  *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994), *abrogated on other grounds*

10

*by Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

Statements that are too vague or general to be relied upon are known as puffery and, by

definition, are not material. *Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515,

532 (S.D.N.Y. 2020) (Caproni, J.) (citing *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v.

JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)) ("*CBS*").

      In addition to being material, a statement or omission must be false or misleading in order

to be actionable. Whether a statement is false or misleading is "evaluated not only by 'literal

truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d

Cir. 2019) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,

595 F.3d 86, 92 (2d Cir. 2010)).

      To base a claim on an omission, such as a failure to disclose a material business

risk, a plaintiff must also plead that the defendant had a duty to disclose the omitted information.

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Section 10(b) and Rule

10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx

Initiatives*, 563 U.S. at 44; *see also Basic Inc.*, 485 U.S. at 239 n.17 ("Silence, absent a duty to

disclose, is not misleading under Rule 10b-5."). An omission is actionable under Rule 10b-5

only when disclosure of the omitted information was necessary to prevent a particular statement

from misleading investors. *See Matrixx Initiatives*, 563 U.S. at 44 (citing 17 C.F.R. § 240.10b-

5(b)).

      Like the FAC, the material misrepresentations or omissions alleged in the SAC under

Section 10(b) and Rule 10b-5 fall into three broad categories: (1) statements contained in Papa

John's Code of Ethics and Business Conduct; (2) positive assertions made in SEC filings, press

releases, and earnings conference calls; and (3) risks disclosed in SEC filings.

1.   *Statements in the Papa John's Code of Ethics and Business Conduct*

Nothing in the SAC or Plaintiff's briefs changes the Court's previous determination that the statements in the Code are quintessential puffery.

"[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted).  In other words, because these are not statements of material fact, they are thus incapable of forming the basis for a Section 10(b) claim.

As Judge Caproni stated in her opinion in *CBS*, courts have allowed claims based on alleged misrepresentations contained in a code of ethics or code of conduct to survive a motion to dismiss only in rare circumstances.  *CBS*, 433 F. Supp. 3d at 532.  One such rare circumstance was the subject of *In re Signet Jewels Ltd. Securities Litigation*, where the court held that certain statements in Signet's code were actionable because they were "directly at odds with the conduct alleged in [the] complaint."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (McMahon, C.J.).  Signet's code stated that the company made employment decisions based solely on merit and that employees could report workplace misconduct through an anonymous process without retaliation.  *Id.*  But in reality, "the company conditioned employment decisions on whether female employees acceded to sexual demands and retaliated against women who attempted to anonymously report sexual harassment."  *Id.*  The court determined that the code's specific statements about reporting and retaliation were materially false and misleading.  *Id.*  Other "generalized statements touting the importance of Signet's relationship with its employees and consumer trust in the Signet brand," however, were the "sort of broad, aspirational, and vague puffery statements that no reasonable investor could

possibly consider significant in making investment decisions." *Id.*, at *18; *see also Singh*, 918 F.3d at 63 (statements in a code of ethics that amounted to "general declarations about the importance of acting lawfully and with integrity" fell "squarely within" the category of inactionable puffery).

In *CBS*, a putative securities class action premised on sexual harassment by CBS's former Chairman and CEO Les Moonves, the court determined that representations in CBS's Business Conduct Statement were "too general and disconnected from Plaintiffs' central theory of securities fraud to be material." 433 F. Supp. 3d at 533. The CBS Business Conduct Statement asserted that the broadcasting company "has a 'zero tolerance' policy for sexual harassment"; that CBS "will" take "all steps" and "remedial action" to stop "sexual harassment" and "protect the workplace environment"; and that CBS "will promptly and thoroughly investigate" sexual harassment allegations. *Id.* at 533-34 (alterations omitted). The court concluded that "[n]o reasonable investor would rely on these statements as assurance that CBS had no high-level executive who was vulnerable to a '#MeToo moment.'" *Id.* at 534.

In *Papa John's I*, the Court held that the Company's Code of Ethics and Business Conduct's statements resembled the statements in the Signet and CBS codes that were held inactionable, because the Code's statements were also vague, broad, and merely aspirational. *See Papa John's I*, 444 F. Supp. 3d at 561 (statements requiring employees to exhibit "the highest ethical standards," committing Papa John's and its employees to comply with "all applicable labor and employment laws and regulations," and ensuring a working environment "free of harassment or other intimidating, hostile or offensive behavior based" on race and gender, among other characteristics and identities).

13

The SAC's allegations regarding the Code are identical to the FAC's allegations. (*Compare* SAC ¶¶ 134-139, *with* FAC ¶¶ 69-74.)  Likewise, Plaintiff's arguments (and footnotes) regarding the Code were largely copied and pasted from its May 19, 2019 oppositions to Defendants' motions to dismiss.  (*Compare* Pl.'s Opp'n to Ritchie Mot. at 15-18, *with* Pl.'s May 19, 2019 Opp'n to Ritchie Mot. at 9-12, ECF No. 66, Pl.'s May 19, 2019 Opp'n to Schnatter Mot. at 3-5, ECF No. 67, *and* Pl.'s Feb. 5, 2020 Letter, ECF No. 79.)

The only noteworthy addition is Plaintiff's reference to pages eight and 11 of the Code, which state that "Papa John's complies with all applicable labor and employment laws and regulations" and that "[f]ailure to comply with the standards contained in this Code and other applicable policies and procedures will subject a team member to corrective action."  (Pl.'s Opp'n to Ritchie Mot. at 15-16, 15-16 n.19; SAC ¶ 138.)  Like the code in CBS and the other statements in the Code, this statement is also vague, broad, and merely aspirational: it makes no promises as to what Papa John's would do to prevent or respond to workplace sexual harassment, and Plaintiff does not allege that Papa John's highlighted its code when the workplace misconduct was brought to light by *Forbes* to reassure investors that its executives would not be impacted by similar allegations.  *See CBS*, 433 F. Supp. 3d at 534; *Papa John's I*, 444 F. Supp. 3d at 561.

In light of these circumstances, no reasonable investor could have relied on the Code's vague assurances in making investment decisions.  *See Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) (Engelmayer, J.) (quoting *UBS*, 752 F.3d at 185) ("[T]he relevant inquiry instead must consider whether the statement made was sufficiently specific that a reasonable investor could rely on it as a 'guarantee of some concrete fact or outcome[.]'").

2.   *Positive Assertions in SEC Filings, Press Releases, and Earnings Calls*

Nothing in the SAC or Plaintiff's briefs warrants changing the Court's previous determination that the positive assertions about the Company's culture in its SEC filings, press releases, and earnings conference calls are inactionable as immaterial puffery. These statements did not assert or imply that Schnatter, Ritchie, or other executives had never engaged in misconduct or would not be implicated in the #MeToo movement. They were, instead, expressions of "general corporate optimism." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 392 (2d Cir. 2015).

Other courts have dismissed as puffery assurances about workplace safety and intolerance for sexual harassment. For example, after firing news correspondent Charlie Rose for sexual misconduct, CBS stated that it had "worked to strengthen existing systems to ensure a safe environment," that it "offer[s] employees discretion and fairness," and that it takes "swift action when [it] learn[s] of unacceptable behavior." *CBS*, 433 F. Supp. 3d at 538. When the court was faced with claims based on former Chairman and CEO Les Moonves's subsequent #MeToo scandal, it regarded these statements as "little more than a pep talk." *Id.*

Another securities class action in this district centered on the decline of CTPartners stock after a *NY Post* article recounted allegations of lewd behavior and gender discrimination by CTPartners' top executives. *Lopez*, 173 F. Supp. 3d at 18. CTPartners responded to the *NY Post* article in a press release, stating that it "takes all allegations of discrimination very seriously . . . [and] is fundamentally committed to a diverse workforce, and promotes an inclusive and positive working environment." *Id.* at 19. The court held that this response was "too hazy and general for any reasonable investor to have relied upon [it]." *Id.* at 28.

In *Papa John's I*, the Court held that the positive assertions about the Company's culture in its SEC filings, press releases, and earnings calls—none of which mentions sexual harassment or misconduct—were too hazy to be misleading.  *See Papa John's I*, 444 F. Supp. 3d at 562 ("We consider our team member relations to be good"; "We are committed to the development and motivation of our team members through programs, incentive and recognition programs and opportunities for advancement"; "The culture of Papa John's, really, is one that attracts really quality people"; "[O]ur most important ingredient is our people. We take care of our people"; "Our people-powered strategy has developed a passionate culture throughout the brand . . ."; "We believe our continuous commitment to enhance culture and quality will further differentiate our premium brand from the rest of the industry"; "Our food, our pizza scores, our service, our culture is at an all-time high"; "An inspired culture will always be our most competitive differentiation"; and "[T]he strength of our culture will determine the success of our strategy.  To be clear, it is not business as usual, at Papa John's.").

The SAC's allegations regarding the Company's positive assertions about its culture in its SEC filings, press releases, and earnings calls are identical to the FAC's allegations.  (*Compare* SAC ¶ 79, *with* FAC ¶ 75; SAC ¶ 81, *with* FAC ¶ 77; SAC ¶ 83, *with* FAC ¶ 79; SAC ¶ 95, *with* FAC ¶ 92; SAC ¶ 97, *with* FAC ¶ 94; SAC ¶ 99, *with* FAC ¶ 96; SAC ¶ 101, *with* FAC ¶ 98; SAC ¶ 103, *with* FAC ¶ 100; SAC ¶ 110, *with* FAC ¶ 102; SAC ¶ 111, *with* FAC ¶ 103; SAC ¶ 113, *with* FAC ¶ 105; SAC ¶ 115, *with* FAC ¶ 107; SAC ¶ 128, *with* FAC ¶ 113; SAC ¶ 130, *with* FAC ¶ 115; SAC ¶ 132, *with* FAC ¶ 117.)  Likewise, Plaintiff's arguments (and footnotes) regarding these statements were largely copied and pasted from its May 19, 2019 opposition to Papa John's and Ritchie's motion to dismiss.  (*Compare* Pl.'s Opp'n to Ritchie Mot. at 17-18,

*with* Pl.'s May 19, 2019 Opp'n to Ritchie Mot. at 11-12.)  These statements were—and still are—immaterial puffery.

3. *Risks Disclosed in SEC Filings*

Nothing in the SAC or Plaintiff's briefs warrants changing the Court's previous determination that the risk disclosures contained in Papa John's SEC Filings are not misleading.

Under Rule 10b-5, "once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Additionally, Item 503(c)[3] of SEC Regulation S-K requires that certain filings "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (Koeltl, J.) (quoting 17 C.F.R. § 229.503(c)).  Courts in this Circuit have generally held that the disclosure requirements of Item 503(c) and Rule 10b-5 are coextensive.  *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (Koeltl, J.) (collecting cases).  Under these provisions, risk disclosures are actionable "half-truths" when a company discloses a risk that could have an impact on its business when, in fact, that risk has already materialized.  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 515-16 (S.D.N.Y. 2013) (Sweet, J.).

In *Papa John's I*, the Court held that the Company's risk disclosures were not misleading.  444 F. Supp. 3d at 562-63 (statement that "our business and brand may be harmed if Mr. Schnatter's services were not available to the Company for any reason or the reputation of

---

[3] Effective May 2, 2019, the SEC relocated former Item 503(c), then-codified at 17 C.F.R. § 229.503(c), to Item 105, now codified at 17 C.F.R. § 229.105.  FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674-01, 12688.  To be consistent with *Papa John's I*, the parties' briefing, and to avoid confusion, the Court will refer to Item 105 as Item 503.  The underlying disclosure requirements, however, remain the same.  *Id.* at 12712 ("The amendments to Item 503(c) relocate the current risk factor disclosure requirements to Subpart 100 . . . without substantively changing the underlying disclosure requirements.").

Mr. Schnatter were negatively impacted").  Plaintiff's argument that the risk of harm caused by

Defendants fueling a toxic workplace culture had materialized was speculative because it pointed

to nothing more than unadjudicated wrongdoing and an increased risk that Schnatter would be

fired.  *Id.* at 563.

The SAC's substantive allegations regarding the Company's risk disclosures are similar

to the FAC's allegations.  (*Compare* SAC ¶ 85, *with* FAC ¶ 81; SAC ¶ 89, *with* FAC ¶ 85; SAC

¶ 91, *with* FAC ¶ 87; SAC ¶ 105, *with* FAC ¶ 81; SAC ¶ 107, *with* FAC ¶ 87; SAC ¶ 117, *with*

FAC ¶ 81; SAC ¶ 119, *with* FAC ¶ 87; SAC ¶ 122, *with* FAC ¶ 109; SAC ¶ 124, *with* FAC ¶

111.)  The gravamen of the SAC's allegations regarding Papa John's risk disclosures is that,

when the Company filed its 2016 10-K statement on February 21, 2017 and its 2017 10-K

statement on February 27, 2018, its risk disclosures were misleading (i.e., the risks identified had

already materialized) because "the #MeToo movement was well underway" and because

"Defendants had knowledge of their own misconduct and the hostile and unlawful work

environment at Papa John's at the time."  (Pl.'s Opp'n to Ritchie Mot. at 4; Pl's Opp'n to

Schnatter Mot. at 11-13, ECF No. 95.)

Plaintiff highlights three additional categories of risk disclosures that it believes are

misleading.  (Pl.'s Opp'n to Ritchie Mot. at 7.)  The first category addresses Papa John's failure

to comply with labor laws: "Our failure, or the failure of any of our franchisees, to comply with

applicable U.S. . . . and other laws, may result in civil and criminal liability, damages, fines and

penalties . . . . [and] could adversely affect our business, financial condition or operating results."

(SAC ¶ 107.  *Compare* SAC ¶ 107, *with* FAC ¶ 87.)  The second category addresses Papa John's

exposure to harassment claims and legal proceedings, and the Company's response to workplace

harassment: "We may be subject to harassment or discrimination claims and legal proceedings . .

. ., and we investigate and take disciplinary action with respect to alleged violations, actions by our team members could violate those policies." (SAC ¶ 126.) And the third category addresses Papa John's failure to manage public incidents: "Consumer perceptions of our brand are affected by a variety of factors . . . . If we are unsuccessful in managing incidents that erode consumer trust or confidence, particularly if such incidents receive considerable publicity or result in litigation, our brand value and financial results could be negatively impacted." (SAC ¶ 122. *Compare* SAC ¶ 122, *with* FAC ¶ 111.)

The Court holds that, even drawing all inferences in favor of Plaintiff, its allegations still fail to show that the risks described above had already materialized at the time the Company filed its 2016 and 2017 10-K statements. Specifically, Plaintiff fails—again—to specify *when* the Company failed to comply with labor laws (and what these labor laws were), *when* the Company's executives engaged in misconduct, and *when* their harassing behavior became widely known (including to those individuals who had the power to fire them). *See Papa John's I*, 444 F. Supp. 3d at 562-63.

Plaintiff continues to rely on general and conclusory claims about the influence of the #MeToo movement and claims that Schnatter and Ritchie were aware of and were "fueling an unlawful workplace culture." (*See* Pl.'s Opp'n to Ritchie Mot. at 4-9; Pl's Opp'n to Schnatter Mot. at 10-13.) Plaintiff points, again, to the July 19, 2018 *Forbes* article, which stated that Schnatter engaged in "illegal and unethical sexual behavior, resulting in at least two confidential settlements." (Pl.'s Opp'n to Ritchie Mot. at 6-7.) This allegation suffers from the same flaw as Plaintiff's other general and conclusory allegations: it does not amount to anything more than uncharged, unadjudicated wrongdoing. *See City of Pontiac*, 752 F.3d at 184 (citations and quotation marks omitted) ("[d]isclosure is not a rite of confession and companies do not have a

duty to disclose uncharged, unadjudicated wrongdoing.").  Even if the risk that Papa John's executives would be disgraced or fired increased with the expanding influence of the #MeToo movement, "[a]n increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading."  *CBS*, 433 F. Supp. 3d at 537-38.

## II.    Omissions Under Item 303 of Regulation S-K

Nothing in the SAC or Plaintiff's briefs warrants changing the Court's previous determination that Papa John's did not have an affirmative duty to disclose information about workplace sexual misconduct.

Item 303 of Regulation S-K creates an affirmative disclosure requirement independent of the related obligations arising under Rule 10b-5.  In the Second Circuit, "Item 303's affirmative duty to disclose . . . can serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure*, 776 F.3d at 101 (2d Cir. 2015).  As relevant here, Item 303 instructs companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  These disclosures are "necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'"  *Stratte-McClure*, 776 F.3d at 101 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 S.E.C Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989)).

"Disclosures required by Item 303 will most often relate to issues in the realm of micro and macroeconomics; for example, a 'reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material

contract.'"  *CBS*, 433 F. Supp. 3d at 541 (quoting Release No. 6835, 1989 WL 1092885, at *4).

Information about workplace sexual misconduct is not categorically exempt from Item 303's

disclosure requirements.  *CBS*, 433 F. Supp. 3d at 541.  Although Item 303 is aimed at trends and

uncertainties related to a company's financial conditions and operations rather than offensive and

scandalous behavior by corporate executives, *Lopez*, 173 F. Supp. 3d at 34, Item 303's disclosure

requirements are "intentionally general, reflecting the Commission's view that a flexible

approach elicits more meaningful disclosure and avoids boilerplate discussions," *CBS*, 433 F.

Supp. 3d at 541-42 (quoting Release No. 6835, 1989 WL 1092885, at *1).  Thus, it is possible

that certain negative revelations about a company's executives "could have just as great an

impact as an erosion of market share on a company's 'financial condition, liquidity and capital

resources, changes in financial condition and results of operations.'"  *CBS*, 433 F. Supp. 3d at

541-42 (quoting Commission Guidance Regarding Management's Discussion and Analysis of

Financial Condition and Results of Operations, Release Nos. 33-8350, 34-48960, 68 Fed. Reg.

75056, 75057 (Dec. 29, 2003)).

In *Papa John's I*, the Court dismissed Plaintiff's Item 303 claim because Plaintiff failed

adequately to plead the existence of an uncertainty that was both "presently known to

management" and "reasonably likely to have material effects on the registrant's financial

conditions or results of operations."  444 F. Supp. 3d at 564.  As the Court noted, "[t]he

possibility that Schnatter and other executives would be exposed as harassers and then forced to

leave the Company or assume diminished roles, and that these changes would reduce revenue by

disrupting operations and damaging the Company's brand, rests on a tenuous chain of causality

and falls short of a known risk, disclosure of which Item 303 would mandate."  *Id.*

The SAC relies on the same general set of allegations as the FAC: that Defendants knew about the misconduct because they themselves participated in it (*Compare* Pl.'s Opp'n to Ritchie Mot. at 11, *with* Pl.'s May 19, 2019 Opp'n to Ritchie Mot. at 18); that Defendants' knew there was an increased risk of public disclosure of the toxic culture at Papa John's in light of the #MeToo movement (*Compare* Pl.'s Opp'n to Ritchie Mot. at 11, *with* Pl.'s May 19, 2019 Opp'n to Ritchie Mot. at 18); and that, in a letter posted after the Class Period, Schnatter admitted to serious misconduct taking place (*Compare* Pl.'s Opp'n to Ritchie Mot. at 11-12 and SAC ¶¶ 160-62, *with* Pl.'s May 19, 2019 Opp'n to Ritchie Mot. at 7-8 and FAC ¶¶ 139-41).  Based on these allegations, Plaintiff concludes that Defendants "knew" that the toxic environment "would have an adverse impact on Papa John's future financial performance – giv[ing] rise to liability under Item 303."  (Pl.'s Opp'n to Ritchie Mot. at 13.)

The Court holds that Papa John's had no affirmative duty to disclose its allegedly toxic workplace culture or accusations of sexual misconduct against its executives.  Like the FAC, the SAC also fails to plead that the likelihood that Schnatter and other executives would be exposed as harassers and then forced to leave the Company was "presently known to management" and "reasonably likely to have material effects on the registrant's financial conditions or results of operations."  *Stratte-McClure*, 776 F.3d at 101 (quoting Release No. 6835, 1981989 WL 1092885, at *4).

First, Plaintiff has not adequately pled that there was a "known" uncertainty that would trigger disclosure under Item 303.  Plaintiff repeatedly points to Defendants' knowledge of an "increased risk of public disclosure" of sexual harassment and executive misconduct Papa John's due to the #MeToo movement.  (Pl.'s Opp'n to Schnatter Mot. at 14; Pl.'s Opp'n to Ritchie Mot. at 11.)  Plaintiff proceeds to conclude that Defendants "would reasonably expect [the disclosure]

to have a material unfavorable impact on the Company's net sales, revenues or income."  (Pl.'s Opp'n to Schnatter Mot. at 14; *see* Pl.'s Opp'n to Ritchie Mot. at 11.)  Plaintiff effectively argues that, at the time Papa John's filed its 2016 10-K statement (February 2017) and its 2017 10-K statement (February 2018), the publication of the two *Forbes* articles (July 2018) and the subsequent media backlash were a matter of "when and not if"—meaning that Defendants somehow knew, at the time of the filings, that their misconduct would eventually be exposed by the media.  Except with the benefit of hindsight, it was entirely speculative that Defendants' misconduct would ever come to light.  *See Lopez*, 173 F. Supp. 3d at 35-36.  Because Plaintiff has not adequately alleged that Defendants knew a public disclosure would occur, the most that the Court can infer from the SAC's allegations is that Defendants were aware of the toxic culture and sexual misconduct at the Company.  The Court declines to hold that the rise of the #MeToo movement alone serves as a basis to impute to Defendants the knowledge that their misconduct would be publicly exposed, where no evidence of such knowledge exists.

Second, Plaintiff has not adequately pled that the toxic culture and sexual misconduct at the Company are "reasonably likely to have material effects on the registrant's financial conditions or results of operations."  Other courts in the Second Circuit have been skeptical of the tenuous link between the potential disclosure of sexual harassment complaints and the impact that such a disclosure will have on a company's financial performance.  *See CBS*, 433 F. Supp. 3d at 542 (noting that, even in light of the #MeToo movement, "[t]he chain of causation between the alleged Moonves-driven 'culture of sexual harassment' and CBS's future financial performance is far too tenuous."); *Lopez*, 173 F. Supp. 3d at 34 ("[T]he information that plaintiff argues should have been disclosed—the offensive behavior of certain CTPartners' executives, such as Sullivan's 'naked romp' at the company retreat and St. John's use of phallic imagery in

discussions with female employees—does not pertain to the [company's] operational results or financial condition."); *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 469 (E.D.N.Y. 2020), *aff'd*, 828 F. App'x 747 (2d Cir. 2020) (holding that the former CEO's sexual misconduct was not about the firm's "operational situation" and did not have a "tight[ ] nexus" to the company's revenue from tax preparation services.).  Again, in *Papa John's I*, the Court held that "[t]he possibility that Schnatter and other executives would be exposed as harassers and then forced to leave the Company or assume diminished roles, and that these changes would reduce revenue by disrupting operations and damaging the Company's brand, rests on a tenuous chain of causality and falls short of a known risk."  444 F. Supp. 3d at 564.

The SAC contains no particularized allegations to bridge this factual gap.  Drawing all reasonable inferences in Plaintiff's favor, the Court is able to infer only that it is *possible* that the misconduct and toxic culture *could* be exposed and that this exposure could have *some* effect on the Company's financial condition.  The SAC's general allegations do not allow the Court to infer that this exposure was "reasonably likely" to have a "material effect" on the Company's financial condition.

Thus, the Court holds that Papa John's did not have an affirmative duty to disclose information about workplace sexual misconduct under Item 303.[4]

---

[4] In so holding, the Court agrees with the concerns that Judge Caproni expressed in *CBS*:

> A threshold for disclosure as low as that advocated by Plaintiffs would require a company to disclose in its [Item 303 disclosures] every possible risk that the company faces. Such a rule runs entirely counter to the central purpose of [Item 303 disclosures]—and federal securities law—to provide the investing public with meaningful, digestible information. Plaintiffs' proposed standard would "bury the shareholders in an avalanche of trivial information."

433 F. Supp. 3d at 542 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).

### III.     Scienter and Loss Causation

Because the Court holds that Plaintiff has not adequately pled a material

misrepresentation or omission under Section 10(b) or Rule 10b-5, the Court has no occasion to

address Defendants' alternative grounds for dismissal, based on alleged deficiencies in Plaintiff's

pleadings as to scienter and loss causation.  *See, e.g.*, *In re China Mobile Games & Entm't Grp.,*

*Ltd Sec. Litig.*, 2016 WL 922711, at *9 (S.D.N.Y. Mar. 7, 2016) (Wood, J.); *Lopez*, 173 F. Supp.

3d at 42.

### IV.     Control Person Liability Under Section 20(a)

Because Plaintiff has not stated a claim for a primary violation of the Exchange Act by

any controlled person, Plaintiff's claims against Schnatter and Ritchie based on control person

liability under Section 20(a) are also incapable of surviving Defendants' motions to dismiss.  *See*

*In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016) (Koeltl, J.)

("[T]he plaintiffs have not alleged a primary violation of Section 10(b) and Rule 10b-5.

Accordingly, the plaintiffs have not satisfied the first element of a Section 20(a) claim, and that

claim must also be dismissed.").

### V.     Leave to Amend

Plaintiff requests leave to amend the SAC should the Court grant Defendants' motions to

dismiss.  (Pl.'s Opp'n to Ritchie Mot. at 25 n.34; Pl.'s Opp'n to Schnatter Mot. at 25 n.21.)

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint shall be

"freely" given when "justice so requires."  "[I]t is the usual practice upon granting a motion to

dismiss to allow leave to replead."  *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013).

Nonetheless, "motions to amend should generally be denied in instances of futility, undue delay,

bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously

allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (citation and internal quotation marks omitted) (denial of leave to amend is appropriate "where the request gives no clue as to how the complaint's defects would be cured."); *Hutson v. Notorious B.I.G., LLC*, 2015 WL 9450623, at *8 (S.D.N.Y. Dec. 22, 2015) (Sullivan, J.) (denying leave to amend because plaintiff "made only a cursory request for leave to amend in his Opposition, without including a proposed amended complaint or any explanation of the facts that would cure the First Amended Complaint's deficiencies.").

Plaintiff has had two opportunities to amend its complaint.  Plaintiff first amended its complaint pursuant to a stipulation.  (ECF No. 49.)  Subsequently, in *Papa John's I*, the Court identified the deficiencies that needed to be cured and granted Plaintiff's request to amend the FAC.  444 F. Supp. 3d at 564-65.  The SAC, however, failed to cure the deficiencies that the Court identified in *Papa John's I*.  As the Court has detailed *supra*, many of Plaintiff's allegations in the SAC and its current opposition briefing—including its barebones request for leave to amend—were copied and pasted from the FAC and its original opposition briefing. (*Compare* Pl.'s Opp'n to Ritchie Mot. at 25 n.34 and Pl.'s Opp'n to Schnatter Mot. at 25 n.21, *with* Pl.'s May 15, 2019 Opp'n to Ritchie Mot. at 25 n.23 and Pl.'s May 15, 2019 Opp'n to Schnatter Mot. at 19 n.22.)

There is no reason to believe that any amendment can cure the SAC's deficiencies, because the statements that Plaintiff contends are actionable were not material, or false or misleading, and Plaintiff has not identified any omitted information that Defendants had an affirmative duty to disclose.  Permitting Plaintiff to file a third amended complaint under these circumstances would be futile and would needlessly burden counsel and the Court.  Thus,

Plaintiff's request to file a third amended complaint is DENIED. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the SAC are GRANTED with prejudice. The Clerk of Court is respectfully directed to terminate the pending motions. (ECF Nos. 84, 87, 90.)


SO ORDERED.

DATED:       New York, New York
             February 3, 2021

                                    _____/s/ Kimba M. Wood_____
                                         KIMBA M. WOOD
                                    United States District Judge